Robert John WOLCOTT, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 9992.

United States Court of Appeals
Tenth Circuit.

March 11, 1969.

Jerry G. Elliott, Wichita, Kan., for appellant.

Guy L. Goodwin, Wichita, Kan. (Benjamin E. Franklin, U. S. Atty., with him on the brief), for appellee.

Before MURRAH, Chief Judge, and LEWIS, BREITENSTEIN, HILL, SETH, HICKEY and HOLLOWAY, Circuit Judges.

MURRAH, Chief Judge.

Petitioner Wolcott pleaded guilty to two violations of the Dyer Act in March, 1966, and was duly sentenced. About eleven months later, he filed a § 2255 motion to set aside the sentence on the ground that he was not mentally competent to waive his constitutional rights and plead guilty. After a full evidentiary hearing, Judge Brown, the sentencing judge, found that Wolcott was mentally competent to plead guilty and denied relief. On this appeal Wolcott asserts that the trial court was aware of facts at plea and sentencing to sufficiently demonstrate the likelihood of his mental incompetence to waive his constitutional rights and plead guilty, thus requiring the court to exercise its protective duty to make further inquiry as to his mental competency; that the court improperly discharged this protective duty by relying upon personal observations, Wolcott's answers to formal questions, and written reports instead of conducting a due process hearing; that the trial court did not cure the error by conducting a post-sentence hearing and retrospectively determining that Wolcott was competent at the time of plea and sentencing; and that the only appropriate remedy at this stage is to vacate the sentence and rearraign the Petitioner.

We are all indeed aware of the sentencing judge's inescapable duty to make appropriate inquiry concerning the mental responsibility of an accused for the offense charged and the mental competency to waive and plead or to stand trial on the charges against him. If the defendant's mental responsibility for the offense is in any way put in issue, the judge must determine whether the legal presumption of criminal responsibility has been dissipated. If so, criminal responsibility becomes an essential element of the offense to be proved beyond a reasonable doubt. See Fitts v. United States, 284 F.2d 108 (10th Cir. 1960); Phillips v. United States, 311 F.2d 204 (10th Cir. 1962); Davis v. United States, 364 F.2d 572 (10th Cir. 1966). And the test for criminal responsibility in this Circuit is laid down in Wion v. United States, 325 F.2d 420 (10th Cir. 1963). See also United States v. Currens, 290 F.2d 751 (3rd Cir. 1961); Feguer v. United States, 302 F.2d 214 (8th Cir. 1962); United States v. Freeman, 357 F.2d 606 (2nd Cir. 1966); Pope v. United States, 372 F.2d 710 (8th Cir. 1967); United States v. Shapiro, 383 F.2d 680 (7th Cir. 1967); United States v. Chandler, 393 F.2d 920 (4th Cir. 1968).

But the threshhold issue in any case is whether an accused is mentally competent to waive his constitutional rights and plead to the charge or stand trial, i. e., competent to understand the nature of the proceedings against him and to rationally consult with his lawyer to prepare his defense. See Dusky v. United States, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed. 824 (1960). We have always recognized the protective duty of the court to investigate as long and thoroughly as the circumstances of the case reasonably demand. The fact that an accused, informed of his rights, formally expresses a desire to waive them does not automatically end the responsibility of the

court. See Snell v. United States, 174 F.2d 580 (10th Cir. 1949); Cherrie v. United States, 179 F.2d 94 (10th Cir. 1949); following Von Moltke v. Gillies, 332 U.S. 708, 68 S.Ct. 316, 92 L.Ed. 309; Miles v. United States, 385 F.2d 541 (10th Cir. 1967). But we have not always agreed whether in a given case the judge has adequately discharged his plain duty. See Ruebush v. United States, 206 F.2d 810 (10th Cir. 1953). It is this seeming contrariety which prompted us to reexamine en banc the case law in light of § 4244 and apply it to the facts of our case.

■ The latest word on the scope of the court's duty to hear and decide mental competency to waive and plead or stand trial is Pate v. Robinson, 383 U.S. 375, 86 S.Ct. 836 (1966). That case reaffirmed the test of competency as reiterated in Dusky, supra, and further articulated the standards by which a sentencing judge shall be guided in the discharge of his highly sensitive presentence responsibilities. It is there said that if any information coming to the attention of the court raises a "bona fide doubt" of the defendant's competency to waive his constitutional rights and plead or to stand trial, it then becomes the inescapable duty of the court to conduct a due process hearing to determine mental competency and to make appropriate findings thereon.[1] The decision is for the court and both expert and lay testimony may be competent.

■ The test of mental competency to waive and plead or to stand trial is "by no means the same test as those which determine criminal responsibility at the time of the crime." See Mr. Justice Harlan in Pate v. Robinson, supra at 389, 86 S.Ct. at 844. See also James v. Boles, 339 F.2d 431 (4th Cir. 1964); United States v. Kendrick, 331 F.2d 110 (4th Cir. 1964); Lyles v. United States, 254 F.2d 725 (D.C.Cir. 1957); Feguer v. United States, supra. Indeed, an accused may be competent under Dusky, supra, to waive and plead, yet be ultimately found mentally irresponsible for the offense committed under Wion, supra. Conversely, he may be held mentally incompetent to waive and plead or to stand trial, though he may have been mentally responsible for the offense.

Judged by these precepts our issue is whether the facts developed at plea and sentencing generated a "bona fide doubt" of the defendant's mental competency, requiring a due process hearing, and if so, whether the defendant has been accorded due process. This determination necessitates a detailed review of the competency evidence brought to the attention of the court and the court's consideration of it.

When Wolcott appeared to plead, the judge noted that he was without counsel and appointed one. The judge then explained in great detail the nature of the charges against him and the procedural safeguards available, including his right to a grand jury indictment and trial to a jury with counsel on a plea of not guilty. The judge was also at pains to explain the authorized penalties in the event of a guilty plea. He then recessed court to give Wolcott all the time he needed to consult counsel, saying: " * * * I would want you to know that I won't accept a guilty plea from you unless you understand what I have just explained to you. The reason I explain it to you now is so that you can have an opportunity to discuss it with Mr. Carter [appointed counsel] and ask him any questions about it. When you come back, you must feel free to ask me any questions that you don't understand." Before recess Wolcott asked the judge if he were to plead guilty, could he be sentenced

1. We have repeatedly held that in a § 2255 proceeding where one of the grounds asserted for relief is mental incompetency at the time of the guilty plea, a § 2255 motion cannot be decided "without a hearing in reliance on report of doctors at Medical Center for Federal Prisoners, since defendant was entitled to an opportunity to cross-examine doctors and to present evidence of his own as to his mental condition." Butler v. United States, 361 F.2d 869 (10th Cir. 1966).

that day. The judge replied that he *could* be, but that he doubted very much if he would because time was needed to investigate his background. The judge and Wolcott then carried on an extensive colloquy about a prison matter which Wolcott brought up. Wolcott seemed to be very much aware of all his rights and entirely capable of asserting them.

When court reconvened that day, the judge questioned Wolcott thoroughly to make sure that he understood what he was doing and was voluntarily and intelligently waiving his constitutional rights by pleading guilty.[2] At one point the judge asked Wolcott if he had ever been incarcerated in a mental institution of any kind. Wolcott replied that he had

been incarcerated for an emotional problem, but that it was four years ago and that the hospital declared him competent and sane at the time "with nothing wrong whatsoever." The judge then asked if he made "any claim that he was not entirely competent", to which he replied in the negative. The judge then observed: "As a matter of fact, it is obvious to the Court that you are perfectly capable of understanding the nature and substance of the charges against you." The judge then accepted his plea of guilty and ordered a presentence report.

Before Wolcott appeared for sentencing, the presentence report revealed to the judge a long and varied history of mental illness and bad conduct.[3] Under

2. After Wolcott assured the judge that he had had ample time to consult with his attorney, the judge continued:

"I would now inquire of the marshal, of the United States Attorney and of the two defendants and also of you, Mr. Carter [appointed counsel], is there any reason to believe that the defendant, Robert John Wolcott, is not able to make an intelligent and comprehensive determination as to whether or not he should execute a waiver in this case to have the matter presented to a Grand Jury?"

After Wolcott formally pleaded guilty, the judge inquired:

" * * * have there been any threats or promises of any kind made to you by anyone to obtain your plea of guilty?"
DEFENDANT: "No sir, Your Honor."
* * * * *
THE COURT: "Are you entering a plea of guilty voluntarily and of your own free will, being fully informed and fully capable of making a judgment to enter your plea, and after consultation with your attorney?"
DEFENDANT: "Yes sir, Your Honor."
* * * * *
THE COURT: "Do you understand that by pleading guilty you make no claim of innocence, but fully and voluntarily admit that you are guilty of the crimes as charged?"
DEFENDANT: "Yes sir, Your Honor."

3. The presentence report disclosed that Wolcott was born out of wedlock in 1947, spent his earliest days in various foster homes where he was mistreated, and was adopted by the Wolcotts at the approximate age of two and one half years. His adoptive mother stated that even

as a young boy, he displayed a vicious temper and crying fits and ran away from home on numerous occasions. In 1961, at the age of fourteen, he was sent to a detention home. He attempted to run away several times and made crude weapons with which he planned to attack the attendants. When he was returned home, he ransacked the house and ran away again. Finally, his parents reported that he was completely beyond their control and he was sent to the Berkshire Farm For Boys, a privately endowed institution reported to have better than average success in rehabilitating youngsters. Wolcott again ran away several times and attempted to commit suicide by cutting his wrists with glass, stabbing himself, and by smoking glue-filled cigarettes. A child psychiatrist found that Wolcott had sociopathic traits and recommended that he be transferred to a mental hospital.

He spent the next two years in a mental hospital but was finally discharged with the following diagnosis: "not suffering from any mental disorders" and "He does not need and cannot benefit from in-hospital psychiatric treatment." While at the hospital, he ran away and joined the army under a false name. Fearing that he might be sent to Vietnam, he revealed his true identity and was discharged and returned to the hospital. The Army reported in July of 1962 that he was suffering from emotional instability reaction. After leaving the hospital, he enlisted in the Navy under his own name with his parents' permission, but was discharged two months later for medical reasons.

the heading of "Mental" the presentence report stated: "The defendant has been hospitalized at Marcy State Hospital, Marcy, New York for mental reasons. He also has been seen by several psychiatrists. All of the reports are in agreement that the defendant is without a mental disorder but is a Psychopathic personality with asocial trends. He has been treated with drug therapy, occupational therapy, recreational therapy, and psychotherapy, and has made no progress. (T)he defendant has also been hospitalized at Bellview Hospital, New York City, New York for indulgence in drugs. There is no fact to indicate that the defendant is actually a narcotic addict, but he has used barbiturates in all forms and has even smoked cigarettes with glue in them. It is suspected that he has at one time or another engaged in the taking of narcotics." Wolcott's formal schooling ended in the ninth grade but two intelligence tests gave him an I.Q. of 119 and 120.

At sentencing, the judge demonstrated that he was familiar with the information contained in the presentence report and had fully considered Wolcott's competency to plead:

> Since his discharge from the Navy in 1965, Wolcott has continued to cause trouble to his parents, has been unemployed most of the time, has broken into a gas station, robbed the same liquor store four different times, and severely beat and robbed an acquaintance in New York; whose car he stole to begin the cross-country trip which resulted in his arrest in Kansas on the Dyer Act violations. On that trip Wolcott and his companion came in contact with a homosexual whom they robbed and beat up after going to a hotel with him. Wolcott explained that he left New York because of the liquor store robberies and that he and his companion planned to make their way across the country by rolling drunks and robbing homosexuals.

4. THE COURT: "You were before the Court, Mr. Wolcott, on the 28th of March, 1966, at which time the Court reviewed with you the charges against you, which were two counts, charging you and Kenneth Clark Cunningham with a violation of 28 U.S.C. or 18 U.S.C. 2312, the Dyer Act, on two

THE COURT: "Under the basis of this psychiatric report you were in a psychiatric ward at Bellevue Hospital in New York. However, these reports seem to indicate that you have no lack of mental capacity with which to make a judgment with respect to your ability to assist in your defense and to know what you are doing."

THE DEFENDANT: "No sir, Your Honor. I requested to go to Bellevue, and they sent me. I had acute alopecia. That is why I went there."

THE COURT: "Tell me what you mean by 'acute alopecia'."

THE DEFENDANT: "Well, I had syphilis, really."

THE COURT: "What?"

THE DEFENDANT: "Syphilis. It was in secondary state and was considered acute alopecia and all my hair was falling out rapidly."

The judge made further inquiry, again explained the charges, again informed him of his constitutional rights, and asked him several times if there was "any reason why sentence should not now be passed upon you?"[4] Finally, at the very

counts of stealing two different cars. One, a 1965 Ford Galaxy, and the other a 1966 Mercury. You drove them from Columbia, Missouri, to Saline County, Kansas, and from Kansas City, Missouri, to Saline County, Kansas, and you were charged with doing both on March 6th, 1966. Did you boys, one of you, drive one car and the other the other?"
THE DEFENDANT: "Yes, sir, Your Honor."
THE COURT: "Did you change over and drive different ones?"
THE DEFENDANT: "No, sir, Your Honor. Well, he drove, Kenneth, drove the Ford and I drove the Mercury. First I was driving the Ford until I picked up the Mercury. Then, I drove the Mercury by myself."
THE COURT: " * * * You have been represented in this matter during all the times that you have been before me here by Mr. Stuart R. Carter, a member of the bar of this Court. Have Mr. Carter's services been satisfactory to you?"
THE DEFENDANT: Yes sir, Your Honor."

end, Wolcott asked the judge to allow his lawyer to make a statement, whereupon his lawyer addressed the court: "I have talked to him at length about the problem that he has had and the matter he has pled guilty to. And he desires that I make this statement to the Court. He would like to be sentenced under the Youth Correction Act. He would also like to be paroled.

"If the Court finds that he cannot see fit to parole him under the circumstances, then he tells me that he would like for it to be made possible for him to go into the Armed Services."

\*   \*   \*   \*   \*   \*

"Then, the third request, if the others are not granted, that is, the parole or in the service option, he would like for Your Honor to send him to Seagoville, Texas, which he tells me—I do not happen to know this—but he tells me it is a Federal Honor Farm, where the men are put to work right away and minimum security is provided. And that was his request."

The judge replied that in his judgment Wolcott was "a little too sophisticated for the Youth Correction Act" and then proceeded to sentence him.

When Judge Brown received Wolcott's § 2255 motion to vacate the sentence on grounds of mental incompetency to plead, he appointed counsel and ordered Wolcott sent to the Medical Center for Federal Prisoners for an examination to determine if Wolcott was mentally competent to participate in the § 2255 proceedings. The examining doctors all found him to be competent and the court so found. The judge then ordered Wolcott to be examined by a local psychiatrist to determine his mental competency to plead in 1966. He found that Wolcott was mentally competent in 1966. A full hearing was then conducted at which the psychiatrist testified. Wolcott's lawyer cross-examined the psychiatrist who gave the opinion that Wolcott was competent in 1966 and presented testimony of subpoenaed witnesses. And Wolcott testified in his own behalf. In sum, Wolcott was accorded all of his rights and afforded every opportunity to support his § 2255 motion.

In his memorandum pursuant to the hearing, the judge reviewed in detail all the evidence bearing on petitioner's competency to plead to the charge both at the time of the imposition of sentence and on the § 2255 motion. In retrospect, the judge did not think that the facts developed at the times of plea and sentencing raised a "bona fide doubt" of his competency to waive and plead. He

THE COURT: "As I explained to you just now, you are charged with violations of the Dyer Act. At the time you pled guilty to both counts of this information, you understood the nature of the charge against you, didn't you?"

THE DEFENDANT: "Yes, sir, Your Honor."

\*   \*   \*   \*   \*

THE COURT: "You voluntarily and of your own free will pled guilty to count one, which was the willful and unlawful transportation in interstate commerce from Columbia, Missouri, to Saline County, Kansas, of a 1965 Ford Galaxy, the property of Hertz Rent-A-Car Agency, which is a violation of 18 U.S.C. 2312, did you not?"

THE DEFENDANT: "Yes, sir, Your Honor."

THE COURT: "And in addition, you pled guilty to on or about March 6th, 1966, you willfully and unlawfully transported in interstate commerce from Kansas City, Missouri, to Saline County, Kansas, a stolen vehicle, to-wit, a 1966 Mercury, the property of Hertz Rent-A-Car Agency, knowing the same to be stolen in violation of 18 U.S.C. 2312, is that correct?"

THE DEFENDANT: "Yes sir, Your Honor."

\*   \*   \*   \*   \*

THE COURT: "And the Court advised you that by your pleas of guilty you were admitting the facts alleged in the information, that you were waiving your Constitutional right to a trial by jury, that you were subjecting yourself to punishment within the limits fixed by law, which was five thousand dollars or five years or both on each count, and that each of the counts could run consecutively, one after the other, is that correct?"

THE DEFENDANT: "Yes sir, Your Honor."

seemed to think, as indeed he might, that the investigation showed rather conclusively that the petitioner, though psychopathic, was entirely competent to intelligently understand the charges against him and consult with counsel. But he did not stop there. He recognized that observation and examination of a defendant in court for sentencing could not be relied upon alone to determine competency, but he was sure that what took place during the sentencing proceedings was distinctly relevant to the question of competency. Considering the searching examination of the defendant at the time of sentencing and his whole mental history, together with the testimony at the § 2255 hearing, the judge was convinced that on the date of his plea and sentencing, Wolcott "had sufficient capacity to consult with his lawyer with complete rational understanding, and in fact did so, and that he had a rational intellectual and factual understanding of the proceedings against him, the nature of the charges he was facing, and the meaning and consequences of a plea of guilty."

When all of the evidence bearing upon the petitioner's competency to plead is considered in its totality, we cannot say that the trial court's conclusion is clearly erroneous. Surely it cannot be said, as the minority seemed to think in Reubush, supra, that the investigation was not as thorough and searching as the court could make it short of a full-fledged due process hearing. Nor can we say that the testimony bearing on competency at the § 2255 hearing was irrelevant to prove the fact of competency at the time of the sentence. This case is not like Pate, where no formal hearing was conducted before or after sentence to determine mental competency to stand trial, nor is it like Dusky where an improper test of mental competency to stand trial was applied and the final decision in the Supreme Court was deemed too late to retrospectively determine the petitioner's mental competency at the time of trial.

On the whole record we are satisfied that the Petitioner was accorded full due process on his mental competency to plead guilty and the judgment is affirmed.