**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Thomas ALLEN, Defendant-Appellant.**

**No. 75–1873.**

United States Court of Appeals, Tenth Circuit.

Argued and Submitted July 29, 1976.

Decided April 26, 1977.

William S. Dixon, Albuquerque, N. M. (Rodey, Dickason, Sloan, Akin & Robb, P.A., Albuquerque, N. M., on the brief), for defendant-appellant.

Victor R. Ortega, U. S. Atty., Albuquerque, N. M. (Mark C. Meiering, Asst. U. S. Atty., Albuquerque, N. M., on the brief), for plaintiff-appellee.

Before HOLLOWAY, McWILLIAMS and BARRETT, Circuit Judges.

HOLLOWAY, Circuit Judge.

Defendant Allen appeals his jury convictions on twenty counts charging violation of the mail fraud statute and causing the use of the mails therefor. 18 U.S.C.A. §§ 1341, 2. The Government's proof tended to show the following facts.

The Bureau of Land Management (BLM) controls the issuance of oil and gas leases on federal lands. 43 C.F.R. § 3100 *et seq.* Lands less valuable for oil and gas exploration are leased by simultaneous drawings. On the third Monday of each month the BLM posts a list of parcels which it proposes to lease by this procedure. Persons interested in a particular parcel must send in an application card, a $10 filing fee and a year's advance rental, computed at 50¢ an acre. An applicant may submit only one card per parcel, but may enter the drawings on more than one parcel. On the fourth Monday of each month all of the cards are put in a hopper and one is selected. The winner is entitled to a 10-year lease to drill

for oil and gas, provided he pays the annual rental. If production is obtained during the 10-year period, the lease is extended. The Government is entitled to a 12½% royalty on production. The leases are assignable.

Defendant is president of Central Southwest Oil Corporation (Central),[1] a leasing service which assisted persons wishing to participate in the simultaneous drawings. Central advertised its services in national magazines and sent information, including BLM application cards, to persons responding to the ads. If a person decided to participate in the drawings, Central handled the filing of application cards and fees with the BLM for a service charge.

The indictment filed in August, 1974, charged that Allen and Central had used the mails in the furtherance of three schemes to defraud involving (1) the assignment of customers' leases to Central (counts I–VIII); (2) the purchase by Central of overriding royalties retained by successful customers (counts IX–X); and (3) the sale by Central to customers of royalty deeds in a supposedly valuable oil prospect called "Cable Ridge" (counts XI–XX).

After a trial lasting three weeks, guilty verdicts were returned against both defendants on all counts. A final judgment was later entered fining defendant Allen $1,000 on each count and also sentencing him to two-years' imprisonment on each count, the sentences to run concurrently. This appeal followed. We will detail additional facts in discussing the issues raised on appeal.

I

*The claim of ineffective assistance of counsel and Allen's competence to commit the offenses*

Allen vigorously argues that his trial counsel's failure to investigate, prepare and assert insanity as a defense demonstrates such a deprivation of his Sixth Amendment right to effective assistance of counsel as to require reversal. Further he says that the trial court's denial of his motion for a new trial, which asserted this ground, was made without a hearing, and that if we believe additional evidence should be adduced on the issue, we should remand for a plenary hearing where Allen, his physicians and his trial counsel could testify.[2]

Defendant's motion for a new trial essentially alleged these facts. Allen was suffering from a severe mental illness during the time of the offenses and was not responsible for his actions; specific intent is an essential element of the crimes· and defendant was incapable of recognizing the importance of information concerning his mental illness and presenting it to the court. On the date of first sentencing,[3] one of defendant's retained trial counsel[4] stated that he had not been aware of the seriousness of defendant's mental illness until a post-trial report from Dr. Winston L. Mar-

---

1. Central was also convicted under the same charges but did not timely file a notice of appeal.

2. We note at the outset that defendant did not assert at the time of trial or in his motion for a new trial that he had been incompetent to stand trial in January, 1975. No such argument is made in defendant's appellate briefs and at argument before us counsel confirmed that no such contention is made.

We have had some concern whether the information before the trial court prior to trial required an examination, hearing and a determination on defendant's competency to stand trial. See *Wolcott v. United States,* 407 F.2d 1149 (10th Cir.), cert. denied, 396 U.S. 879, 90 S.Ct. 156, 24 L.Ed.2d 137. However, on examination of the record we are satisfied there was no error in this respect and none is claimed.

3. In February, 1975, a first sentence on count I was imposed but the court deferred sentencing on counts II through XX for purposes of observation and study pursuant to 18 U.S. C.A. § 4208(b), (c) (R. I, 133). After such study and a report thereon, the court imposed the concurrent 2 year sentences and fines mentioned earlier. (R. I, 150).

4. Two retained trial counsel worked together in defending Allen through the adverse verdict. After the first sentencing, new retained counsel (Mr. Higginbotham) represented Allen and appeared at the second sentencing and filed the motion for a new trial. Later, present retained appellate counsel assumed responsibility for the case.

tin was received by the probation officer, and that if he had known of this information, he would have tried the case on an entirely different basis.[5] The motion for a new trial, filed by other counsel employed by defendant, stated (R. I, 138):

5. Defendant's incapacity and ignorance resulting from his mental illness, place such information in the capacity of newly discovered evidence; or alternatively, newly discovered evidence resulting from ineffective counsel, so as to deprive the Defendant of his 6th Amendment constitutional rights to competent counsel in a fair and just trial.

In further support of the motion, new counsel, Mr. Higginbotham, submitted his affidavit. It said that defendant Allen had

stated that he was not aware of the importance of the information for purposes of trial until so advised by Mr. Higginbotham.

An affidavit of Dr. Winston L. Martin, a psychiatrist, was also submitted. It incorporated a history of defendant's mental condition,[6] opined that Allen was mentally ill in a legal sense when the alleged crimes were committed,[7] and claimed that defendant's failure to bring his mental illness into perspective had been due to his not comprehending its significance.

A psychologist who conducted psychological testing of Allen also submitted an affidavit. His impression of Allen's condition was that of "Schizophrenic potential in a basically obsessive-compulsive character with some defensive decompensation and a

---

**5.** The statement appears in the record of the first sentencing (R. XV, 2–3):

I would say one thing about a comment that the Probation Officer made, that in light of what I now know, he indicated that the Defense apparently did not think that the doctor's opinion was important in the defense of this case. The problem is that I had not realized until I saw the report of the doctor, the seriousness of this matter and what the situation actually was with reference to Mr. Allen's health. Had I known, I might say, I believe that my judgment would have been to waive a jury trial and try the case to the Court on an entirely different basis than that upon which we proceeded, but we were not aware of the situation detailed in the doctor's report until we just saw that report at the same time that the Court and Probation Officer received it.

**6.** Defendant was discharged from the service in 1944 with a service-connected psychotic condition, "Schizophrenic Reaction, Paranoid Type." He had several Veteran's Administration examinations in the next few years with a concluding 1955 diagnosis of "Schizophrenic Reaction, Chronic, Severe." Defendant was confined from April 1, 1970, through May 23, 1970, under Dr. Martin's care. He did poorly after discharge and was readmitted to the hospital and remained there under Dr. Martin's care from August 30 to December 16, 1970. During this latter period he was given extensive electroshock treatments in an effort to control his mental illness. He appeared to be doing better but again became grossly psychotic and was readmitted as a patient under Dr. Martin's

care from April 2 until June 1, 1971, and received a further course of electroshock treatments. On discharge, the doctor felt that Allen was improved but that his illness was not in a state of remission. (R. I, 145).

Dr. Martin continued in contact by occasional office visits, correspondence and by lengthy telephone conversations with Mr. Allen. By September, 1971, his schizophrenic process had again become severe and remained severe through August, 1974, when Dr. Martin had last corresponded with defendant. The doctor's opinion was that defendant had been suffering from his disabling psychotic process from the fall of 1968 through August, 1974. Further the doctor stated that, due to the electroshock therapy, defendant would have a period of "total amnesia (inability to recall any events)" from about July, 1970 to December, 1971. In connection with these dates we note that the period of offenses alleged by the indictment ran from April 24, 1970, through March 23, 1972. (R. I, 145, 147).

**7.** He stated that during this time "Mr. Allen lacked the capacity to appreciate the criminality of his conduct or the capacity to conform his conduct to the requirements of law and that this type of intellectual incapacitation was the direct result of his psychotic process." (R. I, 145–46). Such incapacitation would come within the definition in this Circuit of lack of competence to commit the offenses. See *Wion v. United States,* 325 F.2d 420, 430 (10th Cir.), cert. denied, 377 U.S. 946, 84 S.Ct. 1354, 12 L.Ed.2d 309.

pervasive use of denial." This report was based on an examination of defendant in June, 1975, almost five months after his trial.

The Government's response to the motion and affidavits argued that the cited evidence of alleged insanity was not newly discovered; that Allen knew he had been under psychiatric care and, in fact, had testified about his hospitalization and electroshock treatments at the trial; and that defendant's trial counsel had been questioned by the trial judge and replied that claims of insanity or incompetence were not to be relied on.

The trial court denied the motion for a new trial after consideration of the motion and affidavits, but without a hearing, on the ground that "the evidence should have been discovered prior to trial through the exercise of due diligence by Mr. Allen or his attorneys." (R. I, 165). The court's reasons were explained in some detail. The order said that as early as August 1974—four months before trial—the competency issue was raised by Allen's attorneys in a motion for a continuance which alleged that defendant was in a Minnesota clinic and unable physically or emotionally to attend a hearing. Counsel was requested to submit a report on defendant's condition and was asked if he wanted to arrange for a psychiatric evaluation of Allen. Counsel responded by filing a copy of a letter from Dr. Martin, dated September 6, 1974, stating that he had been treating Allen since April of 1970 and explaining his mental and physical condition.[8] The court concluded that "[e]ven assuming it is in the nature of Allen's illness to conceal its nature and severity, there is no contention that his attorneys or Dr. Martin labored under the same handicap." (R. I, 166–67). The court did not make an express finding or ruling on the alternative ground of ineffective counsel as alleged in defendant's motion.

 The general requirements for a new trial in a criminal case are familiar. The newly discovered evidence must be more than impeaching or cumulative; it must be material to the issues involved; it must be such as would probably produce an acquittal; and a new trial is not warranted by evidence which, with reasonable diligence, could have been discovered and produced at trial. *United States v. Leyba,* 504 F.2d 441, 442–43 (10th Cir.), cert. denied, 420 U.S. 934, 95 S.Ct. 1139, 43 L.Ed.2d 408. The motion is not regarded with favor and is granted only with great caution, being addressed to the sound discretion of the trial court. *United States v. Perea,* 458 F.2d 535, 536 (10th Cir.). The trial court held here that even assuming the first three grounds were satisfied, a new trial should not be granted "because the evidence should have been discovered prior to trial through the exercise of due diligence by Mr. Allen or his attorneys." (R. I, 165). We find no abuse of discretion in the trial court's ruling. Any claim of lack of knowledge of the basic facts about the evidence by trial counsel is untenable and the attempt to transform the argument into one of ineffective counsel must be rejected.

It is true that a factual basis for a substantial insanity defense was developed in the post-trial affidavits of Dr. Martin and the psychologist. See notes 6–7, supra. However, as the court noted, several months before trial the issue of Allen's mental condition had been raised by a motion for a continuance supported by an earlier letter of Dr. Martin and a statement from a psychiatrist at the Minnesota clinic where defendant was being treated. While the diagnosis then was not nearly as serious as stated by the doctor's affidavit after

---

8. Our record contains the pre-trial September 6, 1974, letter from Dr. Martin referred to in the court's order. The diagnosis then given was "Manic Depressive Reaction." The letter said that defendant has experienced both manic and depressive episodes, the depression being more "frequent and devastating;" that in de-pression Allen becomes withdrawn, experiences overwhelming emotional anxiety, and "is essentially not able to function in any meaningful capacity;" that if Allen is again depressed and if he had to appear in court, "he in no way could intellectually function in his own behalf . . . ." (R. I, 181–82).

trial, Dr. Martin's letter put before counsel the basic facts of Allen's hospitalization and that, when depressed, Allen "is essentially not able to function in any meaningful capacity." (R. I, 181). Furthermore, Dr. Martin's post-trial affidavit stated that Mrs. Allen related efforts she made with counsel during the trial to have Allen's psychiatric history presented. (R. I, 146).

At trial evidence on Allen's mental condition was actually presented during direct examination of Allen by his counsel. Allen discussed his hospitalization when testifying about transactions covered by the indictment. (See, *e. g.*, R. XXVIII 1873, 1912–14). His counsel asked where he had been hospitalized and he said at the Ginny Seely Hospital in Galveston for about four months in 1970 and over into 1971. He also stated that he drew 50% disability from the Government for service-connected disability —". . . depression, I think is the simplest thing it's ever been called." He said further that he had received chemical treatment and electroshock therapy during the 1970–1971 hospitalization and that he had observed that the treatment had the effect of causing a complete loss of memory—"I mean, it obliterates some things completely"—but that things forgotten came back to him piecemeal. (Id. at 1913–14)[9]

Thus, when he ruled on the motion for a new trial the trial judge had before him proof of trial counsel's awareness of the essentials of Allen's mental history. The court had also heard trial counsel's statement at the first sentencing, several months before the ruling on the motion, that he did not realize the seriousness of the mental problem until he saw the doctor's report to the probation office and would have tried the case on an entirely different basis, had he known.[10] Weighing all the circumstances the trial court found that the due diligence requirement was not met, and we cannot say there was error in the ruling. *United States v. Perea,* supra, 458 F.2d at 536.

■ Appellate counsel have now expanded the argument and stress the claim of ineffective counsel, which may serve as the basis for a new trial. See *United States v. DeCoster,* 159 U.S.App.D.C. 326, 487 F.2d 1197, 1204–05; *United States v. Brown,* 155 U.S.App.D.C. 177, 476 F.2d 933, 935. While the trial court did not expressly rule on that alternative claim, it was implicitly rejected by the denial of the motion. Defendant says that this was error and that in any event the court should have held an evidentiary hearing on the motion and this claim in particular. We do not agree. The trial court carefully considered the affidavits and had before him the evidence of the lengthy trial, trial counsel's statement that he had not realized the seriousness of the mental problem until after the trial, and the contradictory proof from defendant's testimony and Dr. Martin's pretrial letter.

Defendant has never claimed that he was not competent to stand trial. See note 2, supra. Thus we must treat him as having had sufficient ability at trial to consult with his lawyer with a reasonable degree of rational understanding and as having a rational as well as factual understanding of the proceedings against him. *Dusky v. United States,* 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824; *Wolcott v. United States,* 407 F.2d 1149, 1150 (10th Cir.), cert. denied, 396 U.S. 879, 90 S.Ct. 156, 24 L.Ed.2d 137.

**9.** In this connection, we note that defendant testified in detail about the conversations, trips and documents involved and that his testimony was generally thorough and direct and denied wrong-doing in the various transactions. Occasionally Allen said that he could not remember specifics, but the points involved were not of major importance. For example, he said that he could not recall (1) how many times he talked with or contacted Mr. Kegler, one of his customers; (2) whether there was a potash stipulation in the Sloan lease; (3) whether he visited one of his customers, Mr. George Johnson, in February or the summer of 1971; (4) the visit of Mr. Marshall, a postal inspector. (R. XXVIII, 1883; R. XXIX, 2030–31; R. XXX 2269, 2375–77).

**10.** We must say that this reflects the natural expectation of unsuccessful counsel that improvement could be made the second time around. *Alire v. United States,* 365 U.S. 278, 279 (10th Cir.), cert. denied, 386 U.S. 984, 87 S.Ct. 1290, 18 L.Ed.2d 233.

On this record we cannot agree there was error in not holding an evidentiary hearing to develop the facts further.[11]

■ It seems clear that despite the awareness by defendant and his counsel of the mental problem, it was simply not presented as a defense. To grant a new trial on a claim of ineffective counsel on this record would put a premium on neglect and would encourage a strategy of not making use of available information, with the thought that its later "discovery" might be the basis for a new trial if the verdict was adverse. Cf. *United States v. Passero,* 290 F.2d 238, 244 (2d Cir.), cert. denied, 368 U.S. 819, 82 S.Ct. 36, 7 L.Ed.2d 25; *United States v. Vowteras,* 500 F.2d 1210, 1212 (2d Cir.), cert. denied, 419 U.S. 1069, 95 S.Ct. 656, 42 L.Ed.2d 665. We feel that there was no error in the rejection of the claim of ineffective counsel.

*The claims of prejudicial pre-indictment delay and alleged errors at the hearing thereon*

Defendant moved to dismiss the indictment for violation of his constitutional rights to a fair trial and due process, "resulting in substantial prejudice to the defendants' defenses because of the delay of prosecution." (R. I, 25). After an evidentiary hearing was held as requested, the trial court entered an order stating its findings and denying the motion.

On appeal defendant argues that the ruling was error and urges these principal contentions: that the time lapse between the dates of Allen's alleged offenses and the indictment was unreasonable, being over three and four years except for counts IX and X; that the Government had knowledge of the facts comprising all but counts IX and X for over one year and seven months before the indictment; that Allen suffered prejudice to his capacity to assert his right against self-incrimination in that he gave the Government access to material relating to his operations during this time; that he suffered prejudice due to his loss of memory following the electroshock treatments and the loss of other evidence attributable to the delay; and that the delay was motivated by the Government's design to gain a tactical advantage.

The trial court's order rejecting Allen's contentions is detailed. It addresses fully the contention that Allen was prejudiced because he gave information about his operations to the Government in connection with a civil suit in which both Government officials and Allen were sued by a Mr. Barton in an action challenging the mode of Central's operations under the applicable government regulations. The court emphasized that the issues in the civil and criminal cases were quite different[12] and that Allen was not asked for information by the Government but volunteered it himself.[13]

11. In this connection we note that the motion for a new trial and the supporting brief made no request for such an evidentiary hearing.

12. In this context, we note that the same judge presided over the civil and criminal trials.

13. This portion of the court's order stated (R. I, 69–70):

Several factors should be noted. In the first place, the civil suit involved relatively narrow issues concerning whether or not Department of Interior regulations governing the drawings for leases had been complied with, particularly in regard to the use of money orders in those drawings. This is a quite different matter than the allegations at stake in this indictment. Even more important, Allen was never asked for information about his operations— sometime in early 1972 he became aware that an investigation was going on and volunteered information about his operations. He further requested that the dealings surrounding certain other leases, not involved in the investigation at that time, be included in the investigation in the future. In August of 1972 he called Mr. Neff, one of the Inspectors conducting the investigation, and offered to give him more information on the operations of [Central]. Neff immediately advised him that the investigation underway was a criminal investigation, and that if Allen wished to discuss it, he should bring an attorney with him. Despite this warning, Allen continued to send unsolicited information about his operations to the U. S. Attorney's office, even though he had been dismissed from the suit some months earlier. To dismiss the indictment because of Allen's

The court also found that Allen had been warned by one of the postal inspectors whom he called that a criminal investigation was in progress and that if Allen wished to discuss it he should bring his attorney. Allen then continued to send unsolicited information to the Government. The court also rejected the argument that the action of Allen's earlier counsel in the civil case in "stripping" his file during the interim had prejudiced Allen's ability to show what information he had himself furnished to the Government. The court pointed out that copies of correspondence and documents given to the Government had been furnished to Allen. We are satisfied that the record supports the court's findings on these points.

A further contention is made that a key witness, an engineer who had prepared maps of the Cable Ridge area, had died in the interim. However, this claim was not made in the trial court. Hence there was no record made as to the time of the witness's death or what his testimony would have been, essentials required to demonstrate prejudice. See *United States v. Moore*, 378 F.Supp. 990, 991 (E.D.Pa.). Defendant argues again that he was afflicted by amnesia and could not testify in his defense. As noted earlier, we are convinced the record does not support such a claim by defendant in view of his generally thorough testimony on the transactions. See note 9, supra.

 A claim of denial of due process by pre-indictment delay must be supported by a showing of actual prejudice resulting from the delay and that the delay was purposefully designed to gain some tactical advantage or to harass the defendant. *United States v. MacClain*, 501 F.2d 1006, 1010 (10th Cir.). Without going further into the elements of such a constitutional defense under the principles of *United States v. Marion*, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468, we must sustain the trial

court's conclusion on the ground that prejudice was not shown.

There is a related contention that the trial court erred in not requiring the United States Attorney to testify at the hearing on this issue under a subpoena duces tecum issued to him. At the hearing the prosecutor advised the court that he declined to testify since he did not have permission to testify under regulations governing testimony by Department of Justice personnel. The regulations prohibit a Department employee from disclosing information or producing material in Department files or disclosing information or producing material acquired as part of the performance of his official duties, without prior approval by the appropriate Department official or the Attorney General. 28 C.F.R. § 16.22 (1974). As a procedural predicate for such approval, 28 C.F.R. § 16.23(c) (1974) provided:

> If oral testimony is sought by the demand, an affidavit, or, if that is not feasible, a statement by the party seeking the testimony or his attorney, setting forth a summary of the testimony desired, must be furnished for submission by the U.S. attorney to the appropriate Department official.

 Our record shows no effort by defendant to submit the affidavit or statement summarizing the testimony desired so that the Department could consider the request and determine whether to grant permission for the testimony. In view of this, we feel that defendant is in no position to claim error in the court's refusal to require testimony by the prosecutor. We feel that the regulation controlling such disclosures by Department of Justice employees is valid. See *United States ex rel. Touhy v. Ragen*, 340 U.S. 462, 467–69, 71 S.Ct. 416, 95 L.Ed. 417; *Boske v. Comingore*, 177 U.S. 459, 469–70, 20 S.Ct. 701, 44 L.Ed. 846.

Defendant argues that at least since the decision in *United States v. Nixon*, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039, such an official may be subpoenaed and required to

actions would allow future investigations to be aborted by potential defendants by volunteering information and then

claiming prejudice because of their own actions.

produce relevant evidence. See also *United States v. Andolschek,* 142 F.2d 503, 506 (2d Cir.). We do not have the problem, however, of whether the court should have rejected a refusal by the Department due to the constitutional guarantees of the Fifth and Sixth Amendments. Since the defendant did not follow the procedure and submit the required summary of testimony desired, the Department made no decision whether the prosecutor could testify and we do not reach the constitutional claim.

■ Lastly, defendant argues that the trial court erred in not compelling production of material required by the subpoena duces tecum. The subpoena broadly called for all files and records in the prosecutor's office and the court modified it to require production only of all statements and materials which Allen had furnished the United States Attorney's office (which occurred during the Barton civil case challenging Central's operations) and all other exculpatory material. We see no error in this ruling.

■ The material ordered to be produced gave defendant all that the circumstances required. There was a further demand for materials to establish the information obtained by the Government showing probable cause for an indictment and when it was acquired. However there is no requirement that the Government bring charges as soon as probable cause may exist. See *Hoffa v. United States,* 385 U.S. 293, 309–310, 87 S.Ct. 408, 17 L.Ed.2d 374; *United States v. Chadwick,* 415 F.2d 167, 172 (10th Cir.). Thus there was no independent justification for inquiry on such an issue. The inquiry might have relevance as an element of the general issue of pre-indictment delay under *Marion* principles. But since there was no

showing of prejudice to support such a claim, any error in not opening up this avenue of inquiry was harmless in any event.[14]

In sum, we feel there was no error in the denial of the motion to dismiss for pre-indictment delay or in the procedural rulings relating to this claim.

### III

*Sufficiency of the proof of the dates of Allen's receipt of the application cards*

Defendant contends that the Government failed to prove that the alleged taking and receiving of the application cards involved in counts I through VIII occurred on any specific dates. He says that this lack of proof was fatal and that the convictions on those counts must be reversed.

The validity of this argument depends on the interpretation given to counts I through VIII. The critical paragraph of these counts reads as follows (R. I, 16–18):

> On or about [date], in the State and District of New Mexico, the defendants, THOMAS ALLEN and CENTRAL SOUTHWEST OIL CORPORATION, in executing the aforesaid scheme and artifice to defraud, did take from and receive, and cause to be taken and received from the mails a drawing application card signed by [the allegedly defrauded client] with an address of Post Office Box 2107, Roswell, New Mexico 88201.

The defendant argues that these allegations are meant to cover Central's receipt of the application cards mailed by the customer and that the Government's proof did not establish that the offenses occurred on the dates alleged. The Government contends[15] that the indictment refers to the receipt of the winning application cards, along with

---

14. These and other reasons were suggested by trial counsel as a basis for interrogating the United States Attorney, but we feel them clearly insubstantial.

15. The Government argues that under the concurrent sentence doctrine the issues relating solely to the first eight counts need not be considered if the judgment is to be affirmed as to the remaining counts. Without deciding whether these counts should be reviewed due to possible harm flowing from the multiple convictions, see *Benton v. Maryland,* 395 U.S. 784, 790–91, 89 S.Ct. 2056, 23 L.Ed.2d 707; *Andresen v. Maryland,* 427 U.S. 463, 469 n. 4, 96 S.Ct. 2737, 49 L.Ed.2d 627, separate fines were imposed on each of the 20 counts and review of these counts is thus necessary.

the oil and gas leases for the parcels, after they were mailed from the BLM back to Central and that its proof was sufficient to establish that the offenses occurred reasonably near the dates alleged. We must agree with the defendant's interpretation of the indictment for several reasons.

First, the indictment does not allege that the oil and gas lease was attached to and mailed with the application card received by Central, a surprising omission in view of the fact that the mailing of the lease to Central was an integral, if not the most important element, of the scheme involved in the first eight counts. Second, if the indictment had been intended to cover Central's receipt of the card after it was mailed back from the BLM, it would seem logical to expect that the indictment would have alleged a date nearer the actual time of mailing from the BLM, such as the date of the issuance of the oil and gas lease which occurred nearly contemporaneously with the second mailing. Instead, the dates alleged in the indictment are prior to the simultaneous drawings and bear no logical relationship to the second mailing.[16] Third, the first paragraph of counts I through VIII of the indictment, which details the scheme to defraud, uses the word "mail" only in connection with the

first mailing—that when the signed application card was mailed by the customer to Central.[17] The indictment does not refer to any mailing from the BLM back to Central at all.[18] Accordingly, we agree with defendant that the indictment alleged a use of the mails involving the taking and receiving of the cards when first mailed from the customers to Central.[19] Our inquiry must now focus on whether there was sufficient proof of these acts.[20]

The essential elements of a mail fraud prosecution are (1) a scheme to defraud and (2) the use of the mails to execute or further this scheme. *Pereira v. United States*, 347 U.S. 1, 8, 74 S.Ct. 358, 98 L.Ed. 435. Time is not an essential element of proof in a mail fraud offense. *Jacobs v. United States*, 395 F.2d 469, 474 (8th Cir.). Ordinarily the proof of the acts charged on any date within the statute of limitations and before the return of the indictment is sufficient. *Ledbetter v. United States*, 170 U.S. 606, 612, 18 S.Ct. 774, 42 L.Ed. 1162; *United States v. Davis*, 436 F.2d 679, 682 (10th Cir.); *United States v. Somers*, 496 F.2d 723, 745 (3d Cir.), cert. denied, 419 U.S. 832, 95 S.Ct. 56, 42 L.Ed.2d 58.

An examination of the record reveals a lack of sufficient proof as to five

16. The dates alleged in the eight counts are the exact dates stamped on the face of the application cards. There was no proof as to when or by whom those dates were stamped on the cards.

17. The indictment states (R. I, 15):

. . . defendants solicited such persons to sign a drawing application card and *mail* it plus money . . . to defendant [Central] . . . (Emphasis added)

18. The operation of the first scheme to defraud after a winning card had been drawn was described as follows, with no reference to any mailing from the BLM back to Central (R. I, 15):

It was a part of said scheme and artifice to defraud that when persons who had a drawing application card placed in the Bureau of Land Management drawing by the said defendants won the drawing for a federal oil and gas lease, the defendants obtained an assignment of the federal oil and gas lease from the drawing winner.

19. The Government argues that since Central's address was placed on the application cards after their receipt from the customers, the indictment's reference to receiving an addressed card can only refer to the second mailing. Though initially appealing, this argument fails because there is insufficient proof that it was Central's practice to address the application cards after, rather than before, the customer received, signed and returned them. No firm evidence as to Central's practice was elicited from Allen or the other Central employees who testified and the testimony of the individual customers on this point was sparse and contradictory. Compare R. XIX, 577; R. XX, 736–37 with R. XIX, 391; R. XX, 681–82.

20. This use of the mail having been the one alleged in the grand jury's indictment, we must focus on the proof surrounding it. See *United States v. Radetsky*, 535 F.2d 556, 562 (10th Cir.), cert. denied, 429 U.S. 820, 97 S.Ct. 68, 50 L.Ed.2d 87.

counts. It was not established that the acts alleged in counts I, II, III, V and VII occurred within the five year statute of limitations period (see 18 U.S.C.A. § 3282), which extends only back to August 3, 1969. All of the customers named in counts I through VIII sent more than one card to Central on more than one occasion. Thus, it is impossible to determine when the winning cards were mailed or received. See R. XXIV, 1369–70. The only way to be sure that none of the convictions rests on a use of the mails not within the statute of limitations is to infer that the winning card was included in the victim's first mailing to Central. Under this approach, the record shows that only the customers named in counts IV, VI and VIII of the indictment began to use Central's service on or after August 3, 1969.[21] Accordingly, the convictions with respect to counts I, II, III, V and VII must be reversed since those offenses may be beyond the limitations period.

It remains to be determined whether the convictions on the remaining counts can stand. The problem is whether there is such remoteness and uncertainty of the dates proven as to the taking and receiving from the mail so as to constitute a fatal variance.[22] We recognize that the periods within which the offenses could have occurred under the proof made were of considerable length—approximately 8, 14 and 8 months for counts IV, VI and VIII, respectively. However, we feel the crucial test is whether the variance from the dates alleged was prejudicial. *United States v. Harmon*, 486 F.2d 363, 366 (10th Cir.), cert. denied, 415 U.S. 979, 94 S.Ct. 1568, 39 L.Ed.2d 876; *United States v. Somers*, supra, 496 F.2d at 745 & n. 41.[23]

The inquiry as to prejudice focuses on (1) the effect of the variance on the defendant's ability to prepare his defense and (2) the danger that the defendant might be prosecuted a second time for the same offense. *Berger v. United States*, 295 U.S. 78, 82, 55 S.Ct. 629, 79 L.Ed. 1314; *United States v. Harmon*, supra, 486 F.2d at 366. Allen does not now contend that he was surprised or that the preparation of his defense was hampered, nor does it appear from the record that such was the case. See *United States v. Joyner*, 539 F.2d 1162, 1164–65 (8th Cir.). Furthermore, there was no motion for a bill of particulars. *United States v. Antonelli*, 439 F.2d 1068, 1070 (1st Cir.). Hence we see no prejudice from surprise.

The double jeopardy argument is, however, vigorously pressed. Defendant says that since any card mailed by a customer in prior months might have been the winning card, the Government could prove that a card was mailed to Allen and actually received by him on a date other than that alleged in the indictment, even though the card mailed was in fact the same card whose receipt was the basis for his conviction in this case. In the absence of proof that the cards were in fact received by Allen on the dates indicated thereon, Allen argues he can be reprosecuted for receiving those same application cards at a prior time. Defendant-Appellant's Brief in Chief, 55–56.

We must disagree. Allen bases his double jeopardy argument on the fact that each separate mailing constitutes a separate offense. However, on these facts there could be only one receipt by defendant of the card which was mailed by the

---

**21.** See R. XIX, 389, 533; R. XVIII, 290.

**22.** The defendant does not dispute the Government's proof that the customers mailed in the cards to Central. See Defendant-Appellant's Brief in Chief, 53.

**23.** We are mindful of the familiar instruction, given here, that the proof is sufficient if it establishes beyond a reasonable doubt that the offense occurred on a date reasonably near the date alleged

in the indictment. See *Tafoya v. United States*, 386 F.2d 537, 539 (10th Cir.), cert. denied, 390 U.S. 1034, 88 S.Ct. 1433, 20 L.Ed.2d 294. However, we are satisfied that no prejudice by variance from the dates alleged is shown in this case and the general requirement of being within the limitation period is met on these three counts. Hence as to these counts we feel that no further challenge based on the dates involved should be heard.

customer and which was eventually drawn by the BLM as a winner. The entire record and exhibits, including the cards, may be used to defend against a second prosecution.[24] See *Russell v. United States*, 369 U.S. 749, 764, 82 S.Ct. 1038, 8 L.Ed.2d 240; *United States v. Henry*, 504 F.2d 1335, 1338 (10th Cir.), cert. denied, 421 U.S. 932, 95 S.Ct. 1660, 44 L.Ed.2d 90. We are convinced there is no practical danger of any reprosecution on counts IV, VI and VIII and the convictions thereon should not be set aside.

In sum, in connection with the first scheme the convictions on counts I, II, III, V and VII must be set aside; the proof on counts IV, VI and VIII is sufficient.

## IV

*The "fiduciary duty" issues and alleged trial errors relating to it*

Defendant maintains there were several errors related to the failure of the Government to prove that a fiduciary duty existed between defendant and his customers. He argues that the Government failed to prove the existence of such a duty; that, in particular, counts I through VIII alleged only fraudulent non-disclosures, *i. e.*, that Allen fraudulently failed to disclose to the customers that they had won valuable leases; that without a fiduciary duty, Allen had no obligation to make such disclosures; and thus no violation of the mail fraud statute was shown.

■■■■■ We must disagree. While the existence of a fiduciary duty is relevant and an ingredient in some mail fraud prosecutions, e. g., *United States v. Keane*, 522 F.2d 534, 545 (7th Cir.), cert. denied, 424 U.S. 976, 96 S.Ct. 1481, 47 L.Ed.2d 746; *United States v. Isaacs*, 493 F.2d 1124, 1145–50 (7th Cir.), cert. denied, 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146; *United States v. George*, 477 F.2d 508 (7th Cir.), cert. denied, 414 U.S. 827, 94 S.Ct. 49, 38 L.Ed.2d 61; *Shushan v. United States*, 117 F.2d 110 (5th Cir.), cert. denied, 313 U.S. 574, 61 S.Ct. 1085, 85 L.Ed. 1531, it is not an essential in all such cases.[25] We are convinced that mail fraud prosecution is proper in these circumstances, without proof of any fiduciary duty. See, e. g., *Williams v. United States*, 368 F.2d 972 (10th Cir.), cert. denied, 386 U.S. 997, 87 S.Ct. 1317, 18 L.Ed.2d 345; *Gusow v. United States*, 347 F.2d 755 (10th Cir.), cert. denied, 382 U.S. 906, 86 S.Ct. 243, 15 L.Ed.2d 159.

■■■■ Further, fraudulent representations, as the term is used in 18 U.S.C.A. § 1341, may be effected by deceitful statements of half-truths or the concealment of material facts and the devising of a scheme for obtaining money or property by such statements or concealments is within the prohibition of the statute. *Williams*, supra at 975; *Gusow*, supra at 756; *Lustiger v. United States*, 386 F.2d 132, 138 (9th Cir.), cert. denied, 390 U.S. 951, 88 S.Ct. 1042, 19 L.Ed.2d 1142. Here there were statements concerning the transactions in counts IV, VI and VIII which, taken with the failure

---

**24.** The application cards were offered as exhibits. They were tied in with the leases (also made exhibits) from the BLM which were won by the customers on the ·cards. Thus the transaction to which each card was related was clearly identified in the record and we perceive no danger of uncertainty that might lead to reprosecution for receipt of the same cards which are in our record.

**25.** Defendant relies on the *George, Keane,* and *Shushan* cases. They merely demonstrate that breach of a fiduciary duty is one type of conduct that comes within the ambit of the mail fraud statute, especially in the context of public officials

(*Keane, Isaacs* and *Shushan*) and corporate executives (*George*).

Defendant also cites *Clinkenbeard v. Central Southwest Oil Corp.*, 526 F.2d 649 (5th Cir.), a customer's suit for rescission of a lease assigned to Central. The district court had entered a judgment for rescission based on Central's violation of an agent's fiduciary duty to disclose material facts. The Fifth Circuit reversed, holding that under Texas law the agency relationship of Central to the plaintiff and Central's fiduciary duty terminated when the plaintiff was notified that he had won a lease. We do not agree that these principles are controlling in this federal mail fraud case.

to disclose the facts that valuable leases were involved, amounted to sufficient proof of fraudulent representations under the statute.[26]

The remaining points related to this issue are also untenable. The instruction ruling out consideration of whether a fiduciary duty existed was not error here, although the issue could be germane and thus require a different instruction in other circumstances.

## V

### The claim of error in refusing to allow examination of Inspector Marshall's report

Defendant argues that the trial court erred in denying his counsel the right to examine a report of Postal Inspector Marshal which allegedly contained exculpatory material and statements by Allen to the inspector. He contends that by conducting only an *in camera* examination of the report instead of permitting defendant to examine it, the court violated his constitutional rights, citing *Alderman v. United States*, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176.

*Alderman* dealt with the question whether evidence used at trial was tainted by a prior illegal wiretap—a problem which trial counsel might better assess in light of all of the relevant circumstances. Where, as here, the inquiry is whether certain material might be exculpatory, we feel that an *in camera* examination by the court is constitutionally permissible. *United States v. Ross*, 511 F.2d 757, 765 (5th Cir.), cert. denied, 423 U.S. 836, 96 S.Ct. 62, 46 L.Ed.2d 54; see e. g., *United States v. Gleeson*, 411 F.2d 1091, 1094 (10th Cir.).

The trial court examined the material *in camera*[27] and found that (R. XXIII, 1071):

It has absolutely nothing to do with this particular lawsuit. It didn't cover the same area of time or anything else. It has no business being here and this was the inspector's opinion. The matter was not submitted to the U. S. Attorney. It wasn't submitted to a Grand Jury or anything else. It was one man's opinion.

We have examined the reports and see nothing there material to the defense, nor any exculpatory material discoverable under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct.

---

**26.** As to counts IV, VI and VIII the record tended to show the following:

Count IV (Ferris): that Allen told him he had been a fairly consistent investor and that Central wanted to show its appreciation by giving him $1,000; that he, Ferris, thought the lease assignment he signed was a receipt; and that Allen didn't say anything about him having won a lease. (R. XIX, 534, 535, 544). Allen paid Ferris $1,000 for the lease and agreed to sell it within two weeks for $19,502. Ferris retained a 1% override and Allen retained a 4% override.

Count VI (Marcrum): that Allen said seven people had filed on the lease (when in fact 471 had filed); that as to price for the lease, Allen told him what they were going to pay, and "I just didn't know the real value." (R. XVIII, 299, 301; R. XXIII, 1141). Allen paid Marcrum $3,600 for the lease and agreed to sell it within about one week for $20,000. Marcrum retained a 1% override and Allen retained a 3% override.

Count VIII (Dymersky): that Allen said the land was "pretty well worthless" and was wanted only for access to other valuable lands; and that he, Dymersky, had

to sign some papers and Allen would give him $500. (R. XIX, 393–94, 399–400, 406, 452). In August, 1970, Allen paid Dymersky $500 for the lease and agreed to sell it within two months for $34,400. After some controversy, the lease was ultimately sold to a third party in April, 1973, for $25,800. Dymersky retained no override while Allen retained a 5% override on the 1973 sale.

We are concerned now only with counts IV, VI and VIII. All the remaining counts of the first scheme (*i. e.*, to obtain the assignment of valuable leases to Central from winning customers) are to be reversed for insufficiency of proof in other respects, as discussed earlier. Further, as to all the counts in the other two schemes (to obtain overriding royalties retained by customers and to sell "royalty deeds" from the Cable Ridge area), affirmative misrepresentations were alleged and proven.

**27.** Actually there are both a preliminary and concluding report in our record. They were both sealed in an envelope bearing the statement that it was opened by the trial judge during trial, and the judge's initials.

1194, 10 L.Ed.2d 215. We find no error in the court's ruling or procedure.

Accordingly, for the reasons stated the convictions on counts I, II, III, V and VII must be reversed for insufficiency of proof and as to them the cause is remanded for dismissal of the charges. As to the remaining counts, the judgment is affirmed.