**UNITED STATES of America**

v.

**David L. SIMMONS, Appellant.**

**No. 81–1319.**

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 25, 1981.

Decided Feb. 9, 1982.

As Amended March 5, 1982.

A. Franklin Burgess, Jr., Washington, D. C., with whom William J. Mertens, Washington, D. C., was on the brief, for appellant.

Frederick D. Baron, Asst. U. S. Atty., Washington, D. C., with whom Charles F. C. Ruff, U. S. Atty., John A. Terry, Michael W. Farrell and William J. O'Malley, Jr., Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee.

Before MacKINNON, ROBB and ED-WARDS, Circuit Judges.

Opinion PER CURIAM.

Dissenting opinion filed by Circuit Judge HARRY T. EDWARDS.

PER CURIAM.

Simmons was convicted on two drug counts: (1) Unlawful distribution of a controlled substance, and (2) unlawful possession of a controlled substance with intent to distribute (21 U.S.C. § 841(a)). Concurrent sentences were adjudged on each count of ten years imprisonment, with a special parole term of six years. His two accomplices only violated the distribution statute and they entered guilty pleas to that charge. Simmons' conviction for unlawful possession with intent to distribute was based upon the presence of 4,567 milligrams of heroin in the car he was driving. Simmons contends he was denied his due process right to call a witness in his defense by the threats of the prosecutor to a witness—i.e., one of the co-defendants. Since the facts upon which Simmons bases his due process claim have never been fully developed we remand the record for a hearing.

I.

The only issue on appeal is Simmons' claim that the prosecutor threatened one of his co-defendants Oscie Johnson, that such threats caused Johnson not to testify in Simmons' behalf, and that since such threats turned Johnson into an unwilling witness who refused to testify (when called he claimed self-incrimination and refused to testify) this court must reverse regardless of its assessment of prejudice.

The principal difficulty with appellant's contention is that to find any factual support for it requires us to resort to the most extreme speculation from scanty facts in the record. The claim was only raised cursorily by trial counsel at trial, and as presented at that time, it seemed to the court, and was apparently advanced by counsel, only as a claim that the prosecutor was prohibited from talking to "my" witness. When defense counsel was told that all witnesses were available to all parties he then dropped his objection. The issue presently urged was never subsequently presented to the trial court in the form of a motion for new trial. On this appeal new counsel attempt to present an entirely different picture. Thus, this court is now asked to rule on the basis of speculation and innuendo, and to assume that the prosecutor acting from illegal motives threatened the witness to prevent him from testifying. We refuse to reach this conclusion on the very limited record before us. In our view the charge calls for a full hearing in the first instance before the trial judge.

At such hearing the prosecutor, the co-defendant Oscie Johnson, his attorney Mr. Canan, another co-defendant Mr. Willie Munlyn, the defendant and his lawyer, the undercover agent posing as the desk clerk, and the other police officers [Tr. 49] who were present when the prosecutor talked with Johnson at various times, and other relevant witnesses can all be thoroughly examined and cross-examined. The record also indicates that there are tape recordings of some of the relevant testimony, and these can be closely examined and checked against witness statements. Johnson and

Munlyn's Fifth Amendment rights with respect to the instant offenses have expired and their testimony should clear up several vital points. The court can thus determine whether Johnson was being asked to commit perjury.

At the present time the only record evidence that bears on the issue is the following:

MR. ABBENANTE: (Counsel for Simmons): Your Honor, one brief thing before we call in the Jury: Yesterday I informed Mr. O'Malley after we had some preliminary discussion you may recall about whether or not Mr. Johnson was going to testify or was not going to testify—I had spoken with Mr. Johnson and indicated Mr. Johnson—through Mr. Johnson—he was going to testify.

I informed Mr. O'Malley that he was going to be testifying for the defense.

I found out this morning through a member of his family who was so upset that they came to court today, that Mr. O'Malley brought up Mr. Johnson to his office with—not in the presence of his attorney—yesterday afternoon some time, brought him up from the jail and it's characterized by his sister as being— *badgered Mr. Johnson.* Now Mr. O'Malley has consistently from the beginning of this case tried to enlist the cooperation of Mr. Johnson—met with Mr. Johnson several times and—

THE COURT: That is his privileged. [sic].

MR. ABBENANTE: Your Honor, my position is that he's in a sense intimidating one of *my* witnesses prior—

THE COURT: I can't rule on that. I don't know what he has done or said. As long as he doesn't violate Mr. Johnson's Fifth Amendment rights that is his privilege and I don't know that there is very much I can do about it. I can caution him—

MR. ABBENANTE: Well I can say—

THE COURT: —but *witnesses are available to all parties if they want to testify.*

MR. ABBENANTE: *All right—thank you, Your Honor.*

MR. O'MALLEY: May I say a word, Your Honor?

THE COURT: All right.

MR. O'MALLEY: It is a fact that witnesses are available to all parties—based on the fact that Mr. Abbenante told me that Mr. Johnson was going to testify that is why I had Mr. Johnson visit my Chambers. In fact Mr. Johnson at one time. was going to testify against Mr. Simmons and had told me one story, and having heard that story, it was inconceivable to me that he would now testify for Mr. Simmons.

When Mr. Johnson came to my office his attorney wasn't there and [I] couldn't get in touch with his attorney so I made a telephone call to attempt to do so, but *since his attorney wasn't there I told him not to say anything and I started to warn him about the penalties for perjury at which point Mr. Johnson—I in no way badgered Mr. Johnson*—at which point Mr. Johnson lost control of himself and started screaming and hollering at which point he was removed from my office and went back downstairs.

That is the complete extent of my conversation with him.

THE COURT: Well the only caution I can give you is to be sure you don't violate the Fifth Amendment privilege.

MR. O'MALLEY: Well he was advised, Your Honor, in his conversation with me prior to yesterday that anything he said would not be used against him unless he agreed to testify or unless he did testify and perjured himself.

THE COURT: Well I think we know the rule—all witnesses are available to all parties. Nobody has a latch on witnesses.

(Tr. 1/27/81, 34–37). Later in the trial Johnson appeared in court and the following colloquy took place:

MR. ABBENANTE: Your Honor, Mr. Canan arrived. He is attorney for Mr. Johnson. Do you want to speak to him?

THE COURT: Yes.

(Mr. Canan comes forward.)

THE COURT: Good morning, Mr. Canan. Your man Johnson is back in the cell-block and there is some question whether he should or should not testify. Would you give him a good piece of advice so we can proceed promptly at 1:15?

MR. CANAN: Very well.

THE COURT: Thank you very much. (Recessed for lunch at 11:35 a.m.)

AFTERNOON SESSION—1:15 P.M.

THE COURT: Mr. Canan.

MR. CANAN: I would appreciate having my client out and I would do this in his presence, Your Honor.

(Defendant Oscie Johnson was brought in from the cellblock.)

MR. CANAN: Your Honor, at this point I have advised Mr. Johnson that he still has a Fifth Amendment right and privileges under the Constitution, that he cannot be compelled to testify. I have advised him of that, and I have advised him not to take the witness stand in this case. He is presently pending sentence before Your Honor and he agrees whole heartedly with my advice.

I further advised him that he should not discuss this case with either the defense or prosecution, if either defense or prosecution talked to him, they should contact me first.

THE COURT: All right. Mr. Johnson, you have been well advised. I take it you don't want to testify?

DEFENDANT JOHNSON: That is right.

THE COURT: Very well.

(Tr. 1/28/81, 47–48).

## II.

■ The right of a defendant to establish a defense by presenting his own witnesses is a fundamental element of due process of law. *Washington v. Texas*, 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019 (1979). Two significant cases discuss this issue. First, *Webb v. Texas*, 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972), reversed a conviction for burglary for improper intervention of the trial judge. In that case, without any basis for concluding that a defense witness (a prisoner) might testify falsely, the judge *on his own initiative*, before a defense witness testified, admonished him in a lengthy warning as to his Fifth Amendment rights and the dire eventualities that might and "would" result if he took the stand and testified falsely:

> If you take the witness stand and lie under oath, the Court will personally see that your case goes to the grand jury and you will be indicted for perjury and the liklihood [sic] is that you would get convicted of perjury and that it would be stacked onto what you have already got, so that is the matter you have got to make up your mind on. If you get on the witness stand and lie, it is probably going to mean several years and at least more time that you are going to have to serve. It will also be held against you in the penitentiary when you're up for parole and the Court wants you to thoroughly understand the chances you're taking by getting on that witness stand under oath. You may tell the truth and if you do, that is all right, but if you lie you can get into real trouble. The court wants you to know that. You don't owe anybody anything to testify and it must be done freely and voluntarily and with the thorough understanding that you know the hazard you are taking.

There was nothing in the record to indicate that the judge had any reason to believe that the defendant was likely to lie. No similar warning had been given to any of the other witnesses, and as the Supreme Court found, some of the threats were beyond the power of the trial judge to carry out. He could not guarantee that the grand jury would indict, or if the witness were indicted and convicted, that a consecutive sentence would be imposed, or that the sentence would be probably "several years more," or that his testimony would be held against him in the penitentiary when he comes up for parole. *Webb* thus holds that a defendant is denied due process of law when a trial judge, *without any basis in the record to conclude that a witness might lie, sua sponte* admonishes the defendant's only

witness, and no other witness, to refrain from lying, coupled with threats of dire consequences if he did lie and thereby discourages the witness from testifying and deprives the defendant of an opportunity to present a witness in his own defense.

The second case arose in this circuit. *United States v. Smith*, 478 F.2d 976 (D.C. Cir.1973), involved an Assistant United States Attorney advising a witness (Twitty) who had been subpoenaed by the defendant, that if he took the stand and testified in an ongoing murder trial that he "would"[1] be prosecuted for carrying a concealed weapon, obstructing justice and as an accessory to the murder. He was then not charged with any offenses and the plain inference from the circumstances was that if he did not testify he would not be prosecuted for any of said offenses. The admonition that the prosecutor gave to Twitty was obviously calculated to induce him not to testify for the defense. It was a threat over and above any advice that the record indicated was timely, necessary or appropriate. If the witness were guilty of carrying a concealed weapon, obstructing justice, and being an accessory to the murder, he should have been charged with those offenses whether he testified or not. The prosecutor was obviously threatening the witness to stop him from testifying—*even truthfully*.

During the trial a lawyer from the Public Defender's Service advised Twitty as to his constitutional rights and he decided not to testify because "it wouldn't be in my best interests to testify, the different charges could be brought against me if I testify in this case." This court interpreted the prosecutor's warning as a threat that resulted in depriving the defendant of critical testimony, i.e., that the victim of the murder was armed with a razor and the defendant shot him in self-defense. The record does not indicate anything in the relationship between the witness and the U.S. Attorney that would justify his volunteering such advice. The action of the United States Attorney was completely uncalled-for and constituted an improper threat to deprive the defendant of a witness. The court pointed out that if the prosecutor thought the defense witness should be advised of his rights that he should have suggested the court explain them to the witness.

### III.

While the prosecutor in this case would have been well advised to not discuss Johnson's testimony without his attorney being present we are not of a mind to reverse this conviction on almost pure speculation as to what was said where the most specific evidence is a third party hearsay repetition that the prosecutor "badgered Mr. Johnson." The prosecutor on the other hand said only that "he started to warn him about the penalty of perjury" but "in no way badgered [him]."

The transcript reflects that Simmons was convicted on the following clear and convincing evidence by fully corroborated testimony of several eye witnesses to every detail of the offenses. Simmons was the supplier of the narcotics. (Tr. 1/28/81, 28–29). Police undercover agent No. 1 had discussed with Johnson and Munlyn buying one-eighth of a kilo of heroin for $5,000. (Tr. 1/27/81, 20, 54, 90). Following this discussion Johnson and Munlyn left and returned, in a car driven by Simmons, to a hotel where agent No. 1 was staying. Simmons waited outside while Johnson and Munlyn went to No. 1's room. (Tr. II, 24–26, 94, 162–167). Two other undercover agents, No.'s 2 & 3, were also in the room. (Tr. 1/27/81, 94). Johnson and Munlyn showed No. 2 a sample of the heroin they were offering to sell. Johnson then left the hotel, but Munlyn remained in the room (Tr. 1/27/81, 24–25, 59, 93, 140). After a considerable period of time had passed No. 1 received a telephone call from Johnson who said that, because he was not trusted to deliver the large amount of heroin No. 1 was purchasing, "the Lieutenant" would be coming with him to carry the narcotics. (Tr. 1/27/81, 43, 66, 72). Eventually No. 1 received a telephone call from a police officer who was in radio contact with a surveil-

---

1. According to the testimony of the subpoenaed witness. 478 F.2d at 978.

lance team, telling her that the suspects were in the hotel and were walking to her room. (Tr. 1/27/81, 66–67, 154–155). When there was a knock on the door, No. 1 looked through the peephole and saw *Simmons hand a brown paper bag to Johnson.* (Tr. 1/27/81, 26–29). Simmons (also known as Tiny and the Lieutenant) and Johnson then entered the room where the three undercover agents and Munlyn had been waiting. Johnson introduced Simmons as the "Lieutenant." (Tr. 1/27/81, 28–29, 72–73). Johnson and Munlyn (a/k/a Monman and Monty) then went to the bathroom and No. 1 saw Johnson give Munlyn the brown paper bag he had received from Simmons. Munlyn then came back in to the room and gave the bag to No. 2. (Tr. II, 26–30, 80–81, 97–98). When Simmons, Johnson, Munlyn and No. 1 and others were in the hotel room after the narcotics had been produced the testimony indicated that, "Tiny (Simmons) was going to get the money" for the heroin (Tr. 1/27/81, 61–62). No's 2 and 3 then went with Simmons and Johnson to the lobby to get the money, leaving No. 2 with Munlyn in the hotel room. On the way to the lobby Simmons told No. 1 that if she had been in touch with him sooner he could have helped her leave town earlier. He also told her that, on her next trip, if she would give *him* (Simmons) advance notice he would ensure she would not have any problems; that he could obtain any amount of "good stuff" she needed. Simmons then told No. 1 that Johnson would receive his bonus for his services. (Tr. II 26–32, 73, 79–80).

When they reached the lobby No. 1 obtained her purse from the hotel's safety deposit box and slowly counted out the $5,000 she had agreed to pay Simmons. Simmons asked her to "hustle it up." (Tr. II 75). At about this time on appropriate signal Simmons, Johnson and Munlyn were all arrested. (Tr. 1/27/81, 99). The brown

paper bag the undercover agent had received from Munlyn on analysis was found to contain 39,937 milligrams of 40 percent pure heroin. (Tr. 1/26/81, 58–59, 89–90). This was the basis for the distribution count.

Following the arrests in the hotel the police seized 4,567 milligrams of eighteen per cent pure heroin from the car driven by Simmons. (Tr. 1/26/81, 61–62; Tr. 1/27/81, 169–171). This heroin found in the car that Simmons had driven was the basis for the charge of possession with intent to distribute.

## IV.

Appellant asserts that Johnson could not claim his 5th Amendment right at trial to refuse to testify because he had executed a prior affidavit which "exculpated Mr. Simmons."[2] Simons Brief, p. 11–12, n.4. This affidavit is appended to Simmons' Brief but it is not a part of the record. Simmons claims it should be considered as a proffer. We have examined it and find it not to be exculpatory of Simmons' guilt as proved by the uncontradicted evidence at trial. In the main it is conclusory and asserts conclusions beyond what Johnson is qualified to state. The most significant feature is that it was dated the 6th day of January, 1981, some 20 days *before* the start of the trial and was *not addressed to the facts proven by uncontradicted evidence later introduced at trial.* Most significantly it does not exculpate Simmons from the incriminating fact proved at trial by Undercover Agent No. 1 who was an eye witness to Simmons handing Johnson the brown paper bag containing 39,937 milligrams of 40% pure heroin and who had the conversation with Simmons on the elevator and at the room clerk's desk in the lobby that directly incriminated him.

Johnson was advised that he was thereby waiving his 5th Amendment rights, or that such effect could be claimed, should all be thoroughly explored at the remand hearing. The preparation of this affidavit might have been an attempt to obstruct justice and it might constitute an attempt to suborn perjury.

**2.** The affidavit was crudely drawn and cannot be used to support the claim raised by Simmons that Johnson was thereby precluded from waiving his 5th Amendment right at trial. The circumstances of the taking of this affidavit, the participation of all parties who helped prepare the affidavit, its purpose, and whether

Johnson was observed subsequently handing this brown paper bag to Munlyn and it was this heroin that constituted the controlled substance in the distribution count for which No. 1 was "slowly" counting out the $5,000 to pay *Simmons* (not Johnson) when Simmons asked her to hurry (Tr. II, 75, 90). Simmons also made other damaging oral admissions to No. 1, recited above, that established himself as "the Lieutenant" that Johnson had described him as being, and which indicated that Johnson was merely an intermediary in the transaction. There is additional evidence of Simmons' participation in the offense, some out of his own mouth, that proved his guilt which no statement of Johnson could refute, much less "exculpate."

■ If it is clear that Johnson's proffered testimony constitutes perjury, there is obviously no due process right knowingly to present perjured testimony. If Simmons and his counsel decide to proceed further with the hearing and the court decides to grant a new trial, it is pointed out that Johnson, if he refuses to testify, can be compelled to do so by a grant of immunity, 18 U.S.C. §§ 6002, 6003, and he has no right to refuse to testify because he might commit perjury and be subject to prosecution therefor. A subsequent trial would thus be assured of Johnson's testimony.

## V.

■ It is very significant that Simmons' counsel did not interpret the situation in the extreme light that subsequently appointed counsel for appellant present it at this time. First, he described the prosecutor's actions as trying "to enlist the cooperation of Mr. Johnson—met with him several times . . . my position is that he's *in a sense* intimidating one of *my witnesses* . . ." (emphasis added). Then when the court stated ". . . witnesses are available to all parties if they want to testify," (Tr. 35) counsel withdrew any objection: "[Defense Counsel]: All right—thank you, Your Honor." Thus

defense counsel at trial did not term the prosecutor's actions as "threatening" Johnson, but merely as trying to enlist the cooperation of a witness that defense counsel considered "my witness," by "in a sense intimidating" him. Some lawyers, including prosecutors and defense counsel, consider that they own "their" witnesses, but that is an incorrect interpretation of the law. It is likewise incorrect to interpret every attempt by a prosecutor to enlist a co-defendant as a witness as threatening that witness. When co-defendants are interviewed by prosecutors in an effort to have them testify against their accomplices it is easy for the co-defendant to perceive that he is being intimidated, merely from the authority of the prosecutor, but it takes more than that to prove a threat.

■ It is most significant that despite the fact that Johnson was in the courthouse and fully available to defense counsel that defense counsel never represented that he had conferred with him about the alleged "badgering" and "intimidation." Johnson was brought into the courtroom later after full consultation with his own counsel, and he then, on the advice of counsel,[3] took the 5th Amendment. He told the court that he advised Johnson not to take the witness stand because Johnson was "presently pending sentence" and therefore had a Fifth Amendment right. The record does not indicate that the counsel's advice had anything to do with any alleged threat by the prosecutor. Johnson and his counsel were both available to testify that he had taken this position because of the threats of the prosecutor. Neither, however, made any suggestion whatsoever in this regard. The record is thus woefully short of supporting the claim that the witness was threatened. It is hardly a threat for a prosecutor to advise a potential witness, who is telling two stories with respect to a defendant's criminal involvement, that he might be prosecuted for perjury if he testifies falsely.[4]

---

3. *See* text at 367 *supra.*

4. The facts in the record at this stage do not support the reversal the dissent suggests. (1) While it is true that the government admits to

We thus conclude that the present record is insufficient to support a reversal of the conviction on the claim that Simmons was deprived of a witness' testimony because of threats by the prosecutor. Accordingly, we remand the record for a full hearing on the issues. The claim should only be decided on a fully developed record. This panel retains jurisdiction over the case.

*So ordered.*

HARRY T. EDWARDS, Circuit Judge, dissenting:

Because I believe that this matter presents a clear case of "prosecutorial misconduct"—a fact virtually conceded by the Government during oral argument on appeal—I would reverse.

This case is controlled by our decision in *United States v. Smith*, 478 F.2d 976 (D.C. Cir.1973). In *Smith*, it was alleged that

> the Assistant United States Attorney . . . had spoken to [a potential defense witness] outside of the courtroom and told him that if he took the stand, *he might be prosecuted* for concealed deadly weapon,

[and that] he might be prosecuted as a principal . . . as an aider and abettor.

478 F.2d at 977 (emphasis added). In response to this accusation, the prosecutor in *Smith* stated that he

> felt it incumbent . . . to advise [the potential witness] . . . to seek an independent attorney . . . because . . . *he could be potentially prosecuted. . . .*

478 F.2d at 977–78 (emphasis added). In ruling to reverse the conviction in *Smith*, this court, in an opinion authored by Judge Robb, held that:

> We think the prosecutor's warning was *plainly a threat* that resulted in depriving the defendants of [the witness'] testimony. The government argues in its brief that [the witness] had a right to be advised that he might incriminate himself and be subject to prosecution if he elected to testify, and the government suggests that the prosecutor was only protecting [the witness'] rights when he warned him. Even if the prosecutor's motives were impeccable, however, *the implication of what he said was calculated to transform*

talking to Johnson in his office without the presence of his counsel and that such was a "mistake," they do not admit that the present record supports a conclusion that what took place in the office was improper, that Johnson was threatened, or that Johnson refused to testify because he was threatened by the prosecutor. Rule 52 of the Federal Rules of Criminal Procedure provides: "Any error . . . which does not affect substantial rights shall be disregarded." This means that Simmons must prove substantial prejudice.

(2) Gratuitously labelling what happened as "prosecutorial misconduct" assumes what remains to be proven and characterizing it as "*virtually* conceded" flags the inherent weakness of the conclusion, i.e., it is not fully conceded—not a confession of error—that justifies a *reversal* of a criminal conviction that would set a dangerous criminal free to prey upon society. The present record does *not* support a conclusion that the prosecutor in the interview threatened, coerced or abused Johnson or that he refused to testify because he was threatened and not because he wanted to avoid incriminating himself on the possession charge or because he wanted to avoid committing perjury. Also, the testimony at trial was such that Johnson's testimony could *not* exculpate Simmons on the distribution charge and since Simmons was observed *driving* the car that contained heroin any testimony by Johnson on the pos-

session charge would only have minimal probative value in exculpating Simmons on that offense.

(3) The reliance of the dissent on our decision in *United States v. Smith, supra,* is misplaced. *Smith* involved a plain threat to prosecute a potential witness for *past* crimes if he testified. The prosecutor sought to deprive Smith of a witness. At most the present record only indicates that the prosecutor "*started* to warn [Johnson] of the penalties for perjury." (Emphasis added.) That is not a "plain threat" so both the threat and the prejudice remain to be proven. *Smith* is clearly distinguishable on its facts.

(4) The dissent seems to make the mistake of concluding that Johnson was threatened because he was ushered into a setting where threats, coercion and intimidation *might* have taken place. The prosecutor should not have subjected the government's case to the hazards that are implicit in that situation, but the record to date does not support a finding that Johnson was threatened or that Simmons was prejudiced.

As for the pronouncements by the dissent as to the principles to be applied in our judicial system, we subscribe to them, but do not agree that the record in this case at this time indicates that they were violated.

*[the potential witness] from a willing witness to one who would refuse to testify,* and that in fact was the result. We therefore conclude that *the prosecutor's remarks were prejudicial.* As the Supreme Court of Michigan observed in *People v. Pena*, 383 Mich. 402, 406, 175 N.W.2d 767, 768 (1970), *"[a] prosecutor may impeach a witness in court but he may not intimidate him—in or out of court."* If the prosecutor thought the witness should be advised of his rights then he should have suggested that the court explain them to [the witness]. The matter would then have been presented to [the witness] by the court without any threats or implication of retaliation.

The treatment of the witness requires the reversal of [the] conviction.

478 F.2d at 979 (emphasis added). It is submitted that, for reasons that are quite obvious, *Smith* is indistinguishable from this case and thus controlling.

To my mind, the sanctity of the judicial process is at stake here. The action of the prosecutor in this case—in threatening a potential defense witness with prosecution if he took the witness stand—was coercive, abusive and a gross breach of conduct by an officer of the court. The District Court should not have tolerated this conduct, and this court should not in any way approve it. If we cannot trust officers of the court to act in accordance with the law, then the constitutional safeguards associated with criminal prosecution are worthless.

There is no doubt that members of society justly expect both police protection against those who would violate the law and adequate systems of prosecution to assess the innocence or guilt of those who are charged with crimes. However, it is equally clear that the enforcers of the law cannot be above the law in carrying out their duties. In order for our systems of law enforcement to remain legitimate, criminal prosecutions themselves always must be lawful.

We ascribe so much importance to our legal safeguards because, in our country—unlike some others in the world—we assume that a person is innocent until proven guilty, and we guarantee a full and fair trial in any criminal prosecution. When these assumptions and guarantees are abandoned or abrogated by heavy-handed prosecutors, we risk the introduction of totalitarianism into our judicial process.