UNITED STATES of America, Plaintiff–Appellee,

v.

Terry SMITH, Defendant–Appellant.

No. 90–2257.

United States Court of Appeals, Tenth Circuit.

May 25, 1993.

Rehearing Denied July 6, 1993.

Louis P. McDonald, Albuquerque, for defendant-appellant.

Paula Burnett, Asst. U.S. Atty., Albuquerque, NM (Don J. Svet, U.S. Atty., and James T. Martin, Asst. U.S. Atty., Albuquerque, NM, on the brief), for plaintiff-appellee.

Before McKAY, Chief Judge, HOLLOWAY, Circuit Judge, and BELOT,* District Judge.

HOLLOWAY, Circuit Judge.

Defendant-appellant Terry Smith, convicted after a jury in the District of New Mexico found him guilty of assault with a dangerous weapon with intent to do bodily harm, appeals from the district court's denial of his post-conviction motion for a new trial on the grounds of newly discovered evidence. Smith contends, *inter alia*, that the trial judge's comments caused his key witness for the hearing on the motion to claim her Fifth Amendment privilege and decline to testify. Smith says the judge's warning thus violated the rule of *Webb v. Texas*, 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972). We disagree and affirm.

I

Around midnight on July 10, 1987, an officer of the Navajo Division of Public Safety was called to a trailer house in Shiprock, New Mexico, to investigate a report of a disturbance. Arriving at the trailer, the officer observed a four-wheel-drive vehicle, a white GMC "Jimmy," speeding away from the scene. During the chase that ensued, an occupant of the Jimmy riding on the passenger side of the front seat fired one shot in the direction of one of the police vehicles in

---

* The Honorable Monti L. Belot, United States District Judge for the District of Kansas, sitting by designation.

pursuit. The shot pellets struck the passenger side of the windshield of the police car.

Eventually, the Jimmy stopped and police cars stopped nearby, the closest one approximately 25 or 30 yards away. Under a spotlight, the officers could see a man standing beside the Jimmy. The man beside the Jimmy fired a shotgun in the direction of the nearest officer, who was standing behind the open driver's side door to his vehicle. Though most of the shot pellets hit the front of the police vehicle, several pellets struck the officer's face and one hand. The officer was wounded slightly. An indictment in the District of New Mexico charged the defendant with firing the shot that wounded the officer, and charged his brother, Lloyd Smith, with firing the earlier shot from the moving vehicle.

At trial, Terry Smith's defense was that his brother, Lloyd, had fired the shots that wounded the officer. Some of the government's evidence, primarily the officers' general description of the shooter, pointed to the defendant. The officers testified that the shooter was too thin to have been the defendant's much heavier brother, and that the gunman had worn a white, or light-colored, shirt similar to the shirt the defendant was wearing when he was arrested the next day.

The government's case rested largely on the testimony of the defendant's ex-girlfriend, Victoria Scott, who had been a passenger in the Jimmy.[1] Scott testified that the defendant, wearing a white shirt, had exited from the truck with two other men just before the officer was shot. She said that the defendant had stood beside the truck and had fired twice in the direction of the police car. Though Scott testified that she was "ducked down" in the back seat when the shots were fired, III Supp.R. 95, she stated she was certain that Lloyd was not the shooter. Scott's testimony, while corroborated by other evidence, thus provided the only positive identification of Terry Smith as the shooter. Scott was 15 years old at the time of the shooting, and was 16 when she testified at the defendant's trial.

 The defendant and his brother were tried separately. At the conclusion of the trial in August 1988, the jury acquitted the defendant of assault with intent to murder by use of a dangerous weapon, as charged in count one of the indictment, but convicted him of a lesser included offense of assault with a dangerous weapon with intent to do bodily harm, in violation of 18 U.S.C. § 113(c). The district court sentenced the defendant to serve five years' imprisonment, and we affirmed by an unpublished order and judgment. *United States v. Smith,* No. 88–2737 (10th Cir. Apr. 10, 1990).[2]

## II

### A

Following the defendant's sentencing, Scott signed two affidavits in which she recanted key portions of her trial testimony. In one of the affidavits, dated June 29, 1989, Scott claimed: "I never stated that it was Terry Smith who did the shooting, I was told to duck down when the police were shooting over us, so I could not see who was doing the shooting." Appellant's Brief App. B.[3] In

---

**1.** The government acknowledged the importance to its case of Scott's trial testimony. At one point a prosecutor requested a continuance to locate her because "we can't make a case without Victoria Scott." II Supp.R. 4.

**2.** We have been informed that the defendant has completed his sentence and no longer is under supervision. Thus we consider *sua sponte* whether the fact that the defendant has completed his sentence moots his appeal. We note that it is well established that "a criminal case is moot only if it is shown that there is no possibility that any collateral legal consequences will be imposed on the basis of the challenged conviction." *Sibron v. New York,* 392 U.S. 40, 57, 88 S.Ct. 1889, 1899, 20 L.Ed.2d 917 (1968). Given

the obvious collateral consequences of the defendant's status as a convicted felon we conclude that this appeal is not moot.

**3.** Scott's statement in the affidavit that she had "never stated" that Terry Smith did the shooting directly contradicted her trial testimony. At trial, Scott testified that at the end of the police chase, Terry Smith, the driver, had stopped the Jimmy on a dirt road and that the Smith brothers and another man had gotten out. III Supp.R. 93. Asked to explain what happened next, she gave this account:

Q. Did you see Terry grab a weapon at that time?
A. Yes.

the same affidavit, Scott also claimed that she did not recall saying that the defendant was wearing a white shirt on the night of the shooting. *Id.*[4] In the other affidavit, dated June 30, 1990, Scott claimed an FBI agent had coerced her into giving false testimony implicating the defendant. *Id.* App. C.

On August 15, 1990, the defendant filed, pursuant to Rule 33 of the Federal Rules of Criminal Procedure, a motion for a new trial on the ground of newly discovered evidence. I Supp.R.Doc. 114. Citing Scott's statements in the affidavits recanting her trial testimony, the defendant claimed in general that an FBI agent had coerced Scott to identify the defendant falsely as the assailant. The motion was assigned to the judge who had presided at Terry Smith's trial. He appointed counsel for Scott. *Id.* Doc. 125. On October 16, 1990, the trial judge held an evidentiary hearing on the motion with Scott as the first witness.

As soon as Scott had answered a few preliminary questions, the judge interrupted her, asking:

THE COURT: Just a second now. [Counsel], are you comfortable with her testifying?

[WITNESS' COUNSEL]: Yes, Your Honor, I am. I've discussed it with her and basically told her to tell the truth, and

Q. Do you recall which gun he had?
A. No.
Q: What happened then?
A. He stood by the door and started shooting.
. . . .
Q. When he got out of the car, did he raise [the gun] to his shoulder?
A. Yes.
. . . .
Q. And you said you saw him fire the gun?
A. Yes.
Q. How many times?
A. Twice.
. . . .
Q. How far were you—you were in the back seat of the Jimmy at that time, right?
A. Yes.
Q. How far was Terry from you when he fired the gun?
A. Just a few feet away.
. . . .
Q. Miss Scott, in what direction did Terry Smith fire that gun?
A. (No response.)
Q. He didn't fire it up in the air, did he?

that's what she says she is doing. . . . I've told her about the penalty of perjury, have discussed that with her and have told her that it's very important that she tell the truth. And I believe that she has the capacity to understand that, and she intended to do that.

. . . .

THE COURT: Here's where I am. Counsel is telling me that she's going to recant her testimony from the previous trial. If that's the situation, then it would seem to me that if she testified at the first trial, and she now says that testimony is not correct and recants that testimony, she comes squarely under the perjury statute and ten years.

II R. 5–7. The judge then reviewed the affidavits, and continued the colloquy with counsel by remarking:

[THE COURT:] We've got a problem, Counsel.

. . . .

[PROSECUTOR]: . . . I think that this witness faces considerably more risks and exposure by making a sworn statement under oath in this court proceeding with regard to perjury. . . .

. . . .

A. No.
Q. Did he fire it in the direction of the police car that was directly in back of you?
A. Yes.

*Id.* at 93–95.

**4.** At trial, Scott had testified that earlier in the evening of July 10 the defendant had been wearing a "turquoise shirt with stripes." III Supp.R. 83. Scott had testified that later the defendant and other men had taken her and another woman to a remote area known as Table Mesa. At Table Mesa, Smith testified, the defendant had accused her of being an informant, and had struck her. *Id.* at 77–82. Smith testified that after the group left Table Mesa, the defendant had put on a white shirt. *Id.* at 83–85.

Scott at first identified a government exhibit, a short-sleeved, white tee shirt with yellow piping, as the shirt that the defendant had been wearing at the time of the shooting, but then seemed less certain of the identification. *Id.* at 85. However, she agreed with a prosecutor that she was certain that the defendant had worn either a white or a light-colored shirt at the time of the chase and shooting. *Id.* at 85–86.

... That affidavit at this time simply constitutes evidence that her prior sworn testimony is false. It would be only evidence as to perjury. However, ... if she comes here today, and she testifies in this court proceeding under oath that what she's said previously at the prior court proceeding was false, then it's automatically perjury, because there is inconsistent sworn testimony under [18 U.S.C. § 1623]. So I think that she does, by testifying here today, expose herself to ... considerably more risk and exposure than she faces currently under the affidavit that she's submitted at this time.

[WITNESS' COUNSEL]: Your Honor, I agree with that. I have talked to my client at length.... She realizes the position that she's in.... She will state that she felt [coerced], that she was not truthful, she felt threatened and that she ... did not testify truthfully at that time, and that it bothered her so much that it bothered her in school.

She discussed the matter at length with her family, and she wants to come forward regardless of the consequences to her. I have advised her of those consequences and the position that she's putting herself into, and she wants to testify.

THE COURT: Well, okay. I heard the trial. I've been all through everything Mr. Smith has said. And my problem is more [of] a judicial problem is that my mind is of such a set from having read her affidavit, having heard her testify before, having heard [the FBI agent] testify is that I don't think I'm going to believe her. I'm going to have another judge try this.... [F]irst of all, I don't think she understands that she's probably looking—this is a guideline sentence, ten years. And she's probably looking, under the guidelines, at at least 60 months.

....

... [T]he easiest thing in the world for the government to prove is that you testified one way one day, and you're testifying another way today, and that equates probably to about—the sentence is up to ten years in prison.... And the thing that bothers me is, from reading your affidavit

and hearing [the FBI agent] and having been through this before, that I'm not going to believe you.

I don't know—I'm going to transfer it to another judge....

II R. 9–12.

The judge and counsel next discussed the propriety of recusal. The judge commented:

I guess one of the things that bothers me the most is that I'm sitting here, in essence, and I, maybe ashamedly so, am prejudging her, that I'm not going to believe her testimony because I've heard it all once. I've heard [the FBI agent]. And it just doesn't make any sense what she's saying. And it makes me feel like here I am letting this young lady perjure herself, looking at ten years, all for nothing.

*Id.* at 14.

Later in this October 16, 1990, hearing, one of the defense attorneys noted "for the record" that "my version of the statute indicates that the maximum penalty [for perjury] is five years," not 10 as the judge had stated. *Id.* at 16. The judge replied, "Five years or ten years. Either one is ... a lot of time." *Id.*

The judge recessed the hearing for some 10 minutes. He returned and announced that he was bifurcating the proceedings on Smith's motion for a new trial. The judge transferred the motion to another judge for a determination of whether Scott's testimony was in fact false. The judge stated that if the other judge rejected Scott's effort to recant her trial testimony, then "that would be the end of the motion." *Id.* at 17. However, if the other judge were to determine that Scott's trial testimony had been false, the motion was to return to the first judge for argument and a decision. *Id.*

### B

The hearing on the motion for a new trial resumed on November 1, 1990, before another district judge. Scott was again called as a witness, but, after some preliminary questioning, ended the interrogation by stating: "I refuse to answer that question on the advice of my attorney and I assert my Fifth Amendment rights." III R. 16. The judge

stated that Scott's affidavits alone were not sufficient to warrant a new trial, and denied the motion. *Id.* at 19–20. Smith appeals from the denial of the motion for a new trial.

The defendant contends that the judge's comments at the first hearing on the motion for a new trial and his admonition about perjury effectively drove his key witness on the motion from the stand, and thus violated the rule of *Webb v. Texas,* 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972). Smith also contends that the first judge's recusal was error and that the second judge, who denied the motion for a new trial, committed other errors.

## III

The paramount issue before us is whether the statements of the trial judge violated the principle applied in *Webb v. Texas,* 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972), depriving the defendant of due process and his Sixth Amendment right to have compulsory process for obtaining witnesses in his favor.

In *Webb* a Texas conviction was reviewed after its affirmance by the Court of Criminal Appeals of Texas. After the prosecution had rested its case there, the jury was temporarily excused. During the recess, the accused called his only witness, who had a prior criminal record and was serving a prison sentence. On his own initiative, the trial judge admonished the witness as follows:

"Now you have been called down as a witness in this case by the Defendant. It is the Court's duty to admonish you that you don't have to testify, that anything you say can and will be used against you. If you take the witness stand and lie under oath, the Court will personally see that your case goes to the grand jury and you will be indicted for perjury and the liklihood [*sic*] is that you would get convicted of perjury and that it would be stacked onto what you have already got, so that is the matter you have got to make up your mind on. If you get on the witness stand and lie, it is probably going to mean several years and at least more time that you are going to have to serve. It will also be held against you in the penitentiary when you're up for parole and the Court wants you to thoroughly understand the chances you're taking by getting on that witness stand under oath. You may tell the truth and if you do, that is all right, but if you lie you can get into real trouble. The court wants you to know that. You don't owe anybody anything to testify and it must be done freely and voluntarily and with the thorough understanding that you know the hazard you are taking."

409 U.S. at 95–96, 93 S.Ct. at 351.

Webb's counsel objected to these comments, arguing that the judge exerted such duress that the witness could not freely and voluntarily decide whether to testify for Webb, thus depriving him of his defense by coercing his only witness into refusing to testify. The Texas trial court overruled the objection, and defendant's motion for a mistrial based thereon. The Court of Criminal Appeals rejected a claim of violation of due process, although it did not condone the manner of the admonition. The Supreme Court granted certiorari and reversed. The Court stated that the fact the witness was willing to come to court to testify and refused to do so only after the intimidating comments suggested that the comments were the cause of the refusal to testify. The Court said that the judge implied that he expected the witness to lie and assured him that if he did, he would be prosecuted and probably convicted for perjury. The Court reversed because of infringement of Webb's due process rights, stating that:

[I]n light of the great disparity between the posture of the presiding judge and that of a witness in these circumstances, the unnecessarily strong terms used by the judge could well have exerted such duress on the witness' mind as to preclude him from making a free and voluntary choice whether or not to testify.

409 U.S. at 98, 93 S.Ct. at 353.

We cannot agree that the judge's statements in the instant case at the hearing on the motion for a new trial amounted to a violation of *Webb.* At the outset we note that *Webb* does not "stand for the proposition that merely warning a defendant of the consequences of perjury demands reversal."

*United States v. Harlin,* 539 F.2d 679, 681 (9th Cir.), *cert. denied,* 429 U.S. 942, 97 S.Ct. 362, 50 L.Ed.2d 313 (1976). To the contrary, as a general rule a court "has the discretion to warn a witness about the possibility of incriminating" himself or herself. *United States v. Arthur,* 949 F.2d 211, 215 (6th Cir.1991). Judges and prosecutors do not necessarily commit a *Webb*-type violation merely by advising a witness of the possibility that he or she could face prosecution for perjury if his or her testimony differs from that he or she has given previously. *United States v. Gloria,* 494 F.2d 477, 484–85 (5th Cir.) (en banc), *cert. denied,* 419 U.S. 995, 95 S.Ct. 306, 42 L.Ed.2d 267 (1974).

■ We recognize that a court may abuse its discretion by a warning to a witness and thus violate a defendant's constitutional rights by "actively" encouraging a witness not to testify, or by badgering a witness to remain silent. *United States v. Arthur,* 949 F.2d 211 (6th Cir.1991); *see also United States v. Crawford,* 707 F.2d 447, 449 (10th Cir.1983) (noting "[s]ubstantial governmental interference with a defense witness's decision to testify violates a defendant's due process rights"). A judge's admonition to a witness can violate *Webb* if it is "threatening" and employs "coercive language indicating the court's expectation of perjury." *Harlin,* 539 F.2d at 681.

■ Here the judge giving the warning had heard the trial and the witness' previous testimony, and thus had a particular basis for his remarks. The judge's comments directed to counsel were in substance that, having read the witness' affidavit and having heard her previously testify at trial, he doubted that he was going to believe her. The judge pointed out the strong position the government would have in a perjury prosecution where the witness testified one way one day, and another way today. II R. 11. The witness' attorney told the judge she had discussed the possibility of a perjury prosecution with her client.

In considering whether the judge's remarks were threatening or coercive, then, we consider that the witness seems to have been aware of the possibility that she would be prosecuted for perjury. As one court has observed, "[i]t is hardly a threat for a prosecutor to advise a potential witness who is telling the stories with respect to a defendant's criminal involvement, that he might be prosecuted for perjury if he testifies falsely." *Simmons,* 670 F.2d at 371. Here, rather than being threatening, the colloquy between counsel and the judge focused largely on (1) the witness' awareness of a possible perjury prosecution, and (2) the judge's decision to recuse himself from the evidentiary hearing on the motion for a new trial. We believe that the judge "did not use 'unnecessarily strong terms [that could] have exerted such duress on the witness' mind as to preclude [her] from making a free and voluntary choice whether or not to testify.'" *United States v. Nunn,* 525 F.2d 958, 960 (5th Cir. 1976) (en banc) (quoting *Webb,* 409 U.S. at 98, 93 S.Ct. at 353).

Rather, from our examination of the entire record we conclude that the judge's comments were within the range of discretion given to a trial judge to warn a witness of the possible consequences of perjury. As a part of the justification for the judge's actions, we are cognizant that he was faced with a more real possibility of perjury than in some cases, in that the witness seemed to be preparing to give testimony in direct contradiction of her prior trial testimony, making a government charge of perjury apparently easy to establish. As noted in *United States v. Simmons,* 670 F.2d 365, 368–69 (D.C.Cir.1982): "*Webb* thus holds that a defendant is denied due process of law when a trial judge, *without any basis in the record to conclude that a witness might lie, sua sponte* admonishes the defendant's only witness ... and thereby discourages the witness from testifying...." *Id.* (emphasis added). Here there was a disturbing basis in the record for the judge's concern—the risk of a perjury violation by direct contradiction of prior trial testimony.

Of course, each case must be viewed in light of the particular circumstances and the specific comments made by the judge. Here we are persuaded, as was Judge Wald in *United States v. Blackwell,* 694 F.2d 1325, 1334–35 (D.C.Cir.1982), that such warnings about the danger of perjury did not amount to a *Webb* violation. In *Blackwell,* both the

prosecutor and the trial judge warned a witness of the consequences of perjury on only one occasion. After the warning the prosecutor heard that the witness was going to waive her privilege and testify. This was discussed with the trial judge. The judge then questioned the witness under oath, stating:

> there are always actions of perjury meaning that if you lie under oath that you can be sent away on a new charge.
>
> Do you understand that?
>
> THE WITNESS: Yes.
>
> THE COURT: So it is important for everybody to tell the truth. I just want you to understand what the situation is. All right?
>
> THE WITNESS: Thank you.
>
> THE COURT: Do you still wish to take the stand and testify?
>
> THE WITNESS: Yes.

694 F.2d at 1334. The court concluded that the "conduct of the judge and the prosecutor just recounted does not begin to approach the level of misconduct described in *Webb v. Texas.*" *Id.* at 1335.

There are other factors to consider here. The witness Scott did not make the crucial statement invoking her privilege against self-incrimination before the trial judge. Instead, after the judge stated at the motion hearing that he did not think he was going to believe her, he announced: "I'm going to have another judge try this." II R. 10. A recess of some ten minutes was held and the judge announced that another judge would hear the motion, and that the proceeding would be bifurcated. *Id.* at 14. The further hearing was to be held several days later and actually did not occur until November 1, 1990.

It was at the hearing before the second judge that the witness Scott was called and questioned by defense counsel. She then refused to answer any questions, asserting her Fifth Amendment rights. III R. 16.

This judge held that having considered a proffer of defense statements purportedly made by the witness, there was insufficient evidence to rebut Scott's trial testimony of August 18, 1988, and the motion for a new trial was denied.

Thus it is apparent that the trial judge recessed the October 16, 1990, hearing, recused himself, and afforded the witness an opportunity to appear before a different judge where she made the announcement of her decision that she would not testify. This resumed hearing on the motion occurred on November 1, 1990, which gave the witness time to consider the matter and confer with her attorney.[5] We are convinced that the circumstances as a whole do not amount to a violation of the principle of *Webb v. Texas.*

## IV

There are two remaining claims of error which we will address:

■ Defendant claims that there was prejudicial error in the recusal of the trial judge and the transfer of the matter to another judge, depriving him of due process. We disagree. Such determinations are reviewed for an abuse of discretion. *Hinman v. Rogers,* 831 F.2d 937, 938 (10th Cir.1987). Under 28 U.S.C. § 455(a) (1988), a judge is required to disqualify himself "in any proceeding in which his impartiality might reasonably be questioned." Here the judge had noted that he had an impression about Scott's testimony which was unfavorable to the defendant, based on his prior observance of the trial. He therefore expressed concern about prejudging the defendant's motion. In these circumstances, his decision to recuse himself was clearly a proper step to assure fairness, and in no way an abuse of discretion.

■ Lastly, the defendant asserts that the second judge, who was assigned to conduct the evidentiary hearing, committed several procedural errors in considering the motion

---

**5.** The defendant here argues that the comments by the trial judge were exacerbated by the fact that he made a misstatement concerning the perjury penalty. We are not persuaded by this point. As noted, the error was called to the attention of the court and all in attendance by defense counsel during the October 16 hearing. Before the resumed hearing on November 1, counsel had time to advise Scott about the correct penalty for perjury.

for a new trial. We observe at the outset that the procedure used in this case was unusual, because ordinarily the judge who presided at the trial hears a subsequent motion for a new trial. However, we have concluded that here the trial judge did not abuse his discretion in recusing himself from the evidentiary hearing to determine whether Scott perjured herself at trial. Accordingly, we review the decision of the second judge to deny the motion.

After Scott invoked her Fifth Amendment privilege and refused to testify, the judge made an oral ruling denying the motion. Explaining his ruling, the judge stated that "even accepting the affidavits as proffered by [defense counsel], those are insufficient to overcome her testimony as reflected in the Court proceedings, which is a formal proceeding." The judge further made a "finding that the testimony is more probative than subsequent events—subsequent affidavits made to a private investigator." III R. 19. The judge memorialized the ruling from the bench in a written order in which he again ruled that "there was insufficient evidence before the Court to rebut Ms. Scott's trial testimony." I R.Doc. 135.

Smith contends that the second judge abused his discretion by failing "to hold a complete evidentiary hearing" and by failing to "provide a complete set of findings of fact." Appellant's Brief at 25. We disagree on both counts. Smith was afforded the opportunity for an evidentiary hearing; however, the witness who had earlier indicated she would recant her trial testimony, refused to testify. Further, in this case we believe the judge made an adequate record of the basis of his ruling. The judge quite clearly decided that the contents of the affidavits were insufficient to overcome the witness' trial testimony. We find no abuse of discretion by the judge in his determination to

deny the motion for a new trial. *United States v. Allen*, 554 F.2d 398, 403 (10th Cir. 1977).[6]

Accordingly, the order denying the defendant's motion for a new trial is

## AFFIRMED.

BELOT, District Judge, concurring:

I fully concur in the opinion of Judge Holloway but I write separately because I believe this case is distinguishable from *Webb v. Texas, supra*, in several important respects.

First, the judge's offensive remarks in *Webb* were made during the trial when the defendant was presumed innocent. In this case, the district judge's comments were made at a motion for new trial which occurred after the defendant had been convicted and after this court had affirmed the conviction. Thus, *Webb* did not address the issue presented in this appeal: the extent to which a judge presiding over a hearing on a motion for new trial may caution a witness who is about to recant her testimony given at trial.

Second, this court has consistently held that motions for new trial based on newly discovered evidence are regarded with disfavor and granted only with great caution. *United States v. Youngpeter*, 986 F.2d 349 (10th Cir.1993). When the newly discovered evidence consists of a recantation, it is the duty of the trial court to be satisfied that the challenged testimony was actually false. *United States v. Bradshaw*, 787 F.2d 1385, 1391 (10th Cir.1986). A trial judge may justifiably view such a motion with a jaundiced eye. As this court has cautioned, "[r]ecantation of testimony given under oath at trial is not looked upon with favor. Indeed, such is generally looked upon with downright suspicion." *United States v. Ahern*, 612 F.2d 507,

**6.** In *Allen*, we noted the general requirements for a new trial being granted in a criminal case. The newly discovered evidence must be more than impeaching or cumulative; it must be material to the issues involved; it must be such as would probably produce an acquittal; and a new trial is not warranted by evidence which, with reasonable diligence, could have been discovered and produced at trial. The motion is not regard-

ed with favor and is granted only with great caution, being addressed to the sound discretion of the trial court. 554 F.2d at 403.

Here, we understand and accept the judge's conclusion that the affidavits alone were insufficient to justify granting the motion for a new trial. *See United States v. Mackin*, 561 F.2d 958, 961–63 (D.C.Cir.), *cert. denied*, 434 U.S. 959, 98 S.Ct. 490, 54 L.Ed.2d 319 (1977).

509 (10th Cir.1980), *cert. denied* 449 U.S. 1093, 101 S.Ct. 890, 66 L.Ed.2d 822 (1981). Thus, the district judge had an affirmative duty to conduct an evidentiary hearing to evaluate both the credibility and impact of Scott's recantation, *United States v. Page*, 828 F.2d 1476, 1478 (10th Cir.), *cert. denied*, 484 U.S. 989, 108 S.Ct. 510, 98 L.Ed.2d 508 (1987), and he could properly draw on his knowledge and observations gained as the presiding judge at the original trial. *United States v. Johnson*, 327 U.S. 106, 112, 66 S.Ct. 464, 466, 90 L.Ed. 562 (1946); *United States v. Ramsey*, 761 F.2d 603, 604 (10th Cir.1985), *cert. denied*, 474 U.S. 1082, 106 S.Ct. 851, 88 L.Ed.2d 892 (1986).

Third, the district judge's comments cannot be compared in content or degree with the "gratuitous" and "unnecessarily strong" admonition given by the judge in *Webb*. Nor can they be taken as active encouragement to Scott not to testify or as badgering her to remain silent. *United States v. Arthur*, 949 F.2d 211, 215, 216 (6th Cir.1991). Nor do they amount to the coercive and repeated threats about perjury which were condemned (but not without dissent) in *Anderson v. Warden, Maryland Penitentiary*, 696 F.2d 296 (4th Cir.1982) (en banc).

Fourth, the witness in *Webb* was unrepresented. Here, Scott *was* represented which, while not in and of itself decisive, militates against a finding that Scott's later refusal to testify was the product of judicial coercion or other improper conduct by the district judge.

In this case, the district judge knew that Scott intended to recant her trial testimony and that he was faced with a witness who either had committed perjury at the trial or who was prepared to do so at the hearing. Thus, the district judge's concern was not the product of mere suspicion, but of absolute certainty of the existence of perjurious testimony. Under the circumstances of this case, the district judge had the discretion to inform Scott of the consequences of her recan-

tation. It may be that he had the obligation to do so, but that is not an issue which requires decision. Therefore, I believe the district judge's statements and actions were properly within his discretion and not violative of *Webb*.

McKAY, Chief Judge, dissenting:

I respectfully dissent. While I recognize that the trial court was faced with a difficult situation, and acted with commendable motives, I conclude that its statements regarding Ms. Scott's testimony went further than is permitted under *Webb v. Texas*, 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972).[1]

I

Judges have a legitimate interest in ensuring that all witnesses are aware of both the nature of the perjury laws and their Fifth Amendment right against self-incrimination, whether or not the witness is represented. *See, e.g., United States v. Arthur*, 949 F.2d 211, 215 (6th Cir.1991). Nevertheless, there is an inherent tension between this interest and the rights of the defendant under *Webb*. As the Seventh Circuit has stated in the context of prosecutors (rather than judges):

Situations [in which defense witnesses may expose themselves to prosecution] call upon prosecutors to walk a narrow path. On the one hand, *Webb* cautions that "[s]ubstantial government interference with a defense witness' free and unhampered choice to testify violates due process." *United States v. Goodwin*, 625 F.2d 693, 703 (5th Cir.1980). On the other hand, ethical duties require prosecutors to warn unrepresented witnesses of the risk that the testimony they are about to give may be used against them. *United States v. Jackson*, 935 F.2d 832, 846–47 (7th Cir. 1991) (other citations omitted). I believe that judges must walk the same narrow path.[2]

---

**1.** I agree with the conclusion in part IV of the majority opinion that Defendant's other claims of error are without merit.

**2.** While *Webb* itself speaks only of judges, courts have looked to *Webb* in addressing witness intimidation by many different types of state actors.

Thus, we applied *Webb* to prosecutors, *see United States v. Crawford*, 707 F.2d 447, 449 (10th Cir. 1983), and have phrased the test as whether there is "substantial *governmental* interference with a defense witness's decision to testify." *Id.* (emphasis added). Other courts have jointly analyzed whether "[t]he conduct of the judge and

Because *Webb* does not, on its face, suggest a simple test for distinguishing proper concern from improper intimidation, I look to the decisions of other circuits since *Webb* to discern a pattern. On the one hand, they have established that merely informing the witness of her rights is not error. *See Jackson*, 935 F.2d at 847 (no error where the prosecutor, in the presence of the judge and defense attorneys, "simply presented [the witness] with the fact[ ]" that he was the target of an FBI investigation concerning possible subjects of his testimony); *United States v. Harlin*, 539 F.2d 679, 681 (9th Cir.) (a mere warning of the consequences of perjury does not violate *Webb;* a violation occurs only if the admonition is coercive and indicates the court's expectation of perjury), *cert. denied*, 429 U.S. 942, 97 S.Ct. 362, 50 L.Ed.2d 313 (1976); *United States v. Nunn*, 525 F.2d 958, 960 (5th Cir.1976) (no error where the trial court explained the perjury laws to a witness who claimed ignorance of them and who subsequently declined to testify); *United States v. Gloria*, 494 F.2d 477, 485 (5th Cir.) (no error where the judge and the prosecutor "merely advised [the witness] of the possibility of prosecution if his testimony materially differed from his prior plea"), *cert. denied*, 419 U.S. 995, 95 S.Ct. 306, 42 L.Ed.2d 267 (1974).

On the other hand, judges and prosecutors may not recommend a particular choice to the witness, *see Arthur*, 949 F.2d at 215–16 (district court may not "actively encourage[ ] a witness not to testify or badger[ ] a witness into remaining silent"; the lower court erred by telling the witness, "I think it's not in your best interest to testify."), or intimidate a witness with threats or statements that

they expect perjury. *See Anderson v. Warden, Maryland Penitentiary*, 696 F.2d 296, 299 (4th Cir.1982) (en banc) (habeas granted where the state judge "openly and successfully pressed defendant's two key witnesses to change their testimony"), *cert. denied*, 462 U.S. 1111, 103 S.Ct. 2463, 77 L.Ed.2d 1340 (1983); *United States v. Morrison*, 535 F.2d 223, 228 (3d Cir.1976) (reversal after the prosecutor repeatedly threatened a defense witness with perjury and drug charges if she testified); *Berg v. Morris*, 483 F.Supp. 179, 183–84 (E.D.Cal.1980) (habeas granted where state judge clearly indicated his disbelief of the witness's testimony and threatened the witness with perjury charges and parole revocation). If judges and prosecutors do instruct a witness on his rights, they "can do no more than to advise the witness of the risks he may bring upon himself, presenting this advice in a manner calculated to engender informed and uncoerced decisionmaking on the part of the witness." *Jackson*, 935 F.2d at 847.

The majority cites *United States v. Simmons*, 670 F.2d 365 (D.C.Cir.1982), for the proposition that courts have more leeway when they have reason to believe that the witness is lying. *See* Maj.Op. at 680–81; *Simmons*, 670 F.2d at 368. The dissent of Justice Blackmun, however, makes clear that the trial court in *Webb* may have had ample reason to believe that the witness was lying. *See Webb*, 409 U.S. at 99, 93 S.Ct. at 354 (Blackmun, J., dissenting). Nevertheless, the Supreme Court *summarily* reversed, *id.* at 98, 93 S.Ct. at 353, without permitting either oral argument or inquiry on remand concerning the evidence of perjury, as Justice Blackmun suggested. *Id.* at 98–99, 93

the prosecutor [violated] *Webb*," *United States v. Blackwell*, 694 F.2d 1325, 1335 (D.C.Cir.1982), and have applied *Webb* and its progeny to such diverse state actors as FBI agents, *United States v. Hammond*, 598 F.2d 1008, 1012–13 (5th Cir. 1979), IRS agents, *United States v. Heller*, 830 F.2d 150, 152, 154 (11th Cir.1987), prison officials, *see United States v. Goodwin*, 625 F.2d 693, 702–03 (5th Cir.1980) (directing the trial court, on remand, to investigate a possible due process violation resulting from prison officials intimidating inmate-witnesses), and even agents of a different sovereign, *United States v. Smith*, 577 F.Supp. 1232, 1235–36 (S.D.Ohio 1983) (intimidation by state police officer in a federal case).

There is no discernible difference in the standards applied to these different officials. Frequently, courts intermingle citations to cases involving judges, prosecutors, and other officials in the case law. *See, e.g., Heller*, 830 F.2d at 152; *United States v. Risken*, 788 F.2d 1361, 1370–71 (8th Cir.), *cert. denied*, 479 U.S. 923, 107 S.Ct. 329, 93 L.Ed.2d 302 (1986); *Blackwell*, 694 F.2d at 1333–34; *Hammond*, 598 F.2d at 1012. Thus, in determining whether the present record shows a *Webb* violation, I look beyond cases of judicial intimidation to precedent involving prosecutors and other government officials.

S.Ct. at 353–54. Under *Webb*, then, a reason to believe the witness is lying is not relevant to the issue of constitutional error.

Against this backdrop, the parameters of the discretion of judges and prosecutors in *Webb*-type situations become more clear. Both judges and prosecutors have an entirely proper interest in ensuring that witnesses are fully aware of their rights and of the legal consequences of their testimony. Where, as in this case, the potential witness both is young and has a close relationship with the defendant, the court has particularly wide discretion in ensuring that the witness has made a truly informed decision, with full advice from competent counsel. Nevertheless, the decision to testify remains up to the witness, and the role of advisor rests with her counsel.

Trial courts are placed in a difficult position when a witness makes a decision to testify which, while fully informed, is also very likely to lead to some form of criminal liability. Despite the natural desire to dissuade the witness from a decision she might bitterly regret in the future, the court must not attempt to influence her decision. The court's role is limited to being a neutral source of information—not of advice or advocacy. Its instructions must be calculated merely to inform—not to persuade, threaten, or coerce. Elaborations beyond that risk running afoul of *Webb*.

The record in this case clearly shows that the trial court went beyond these limits. Faced with a young woman who wished to contradict her trial testimony with an implausible story of coercion by an FBI agent, the court explicitly stated that it believed she would perjure herself in a lost cause. (*See* II R. at 14) ("[H]ere I am letting this young lady perjure herself, looking at ten years, all for nothing.") While the court acted in good faith and with commendable motives, its desire to see Ms. Scott not testify as proffered was plain. On the face of its statements, it is

apparent that the court was attempting to dissuade Ms. Scott from testifying. *Webb* does not permit such action, however well-intentioned.

The majority's quotation of *United States v. Blackwell*, 694 F.2d 1325 (D.C.Cir.1982), Maj.Op. at 680–81, only underlines the *Webb* violation present in this case. The trial court in *Blackwell*, as shown by the quotation, merely inquired whether the witness was aware of her rights. At no time did the trial court in *Blackwell* suggests its own opinion as to whether the witness should testify. The trial court in this case went well beyond these limits, and openly sought to persuade the witness to change her mind.

In addition, I cannot agree with the suggestion in the special concurrence that *Webb* is not applicable in this post-conviction context. As an initial matter, *Webb* is about the fundamental right of a defendant to present witnesses on his behalf, which was enshrined in our Compulsory Process Clause. I am aware of no authority that stands for the proposition that a defendant has a lesser compulsory process right in a post-conviction proceeding. Further, while the special concurrence is correct in pointing out that a defendant seeking a new trial based on recanted testimony faces a formidable burden, that principle applies to the trial court's ultimate weighing of the evidence—not to the dimensions of the defendant's compulsory process rights. Finally, I cannot agree that the fact that the witness was represented by counsel militates against finding a *Webb* violation. Where the witness is represented, the trial court has less reason to fear that the witness will act in ignorance of the legal consequences of her testimony. Indeed, in this case the witness's counsel assured the court that the witness had made a fully informed decision to testify. That should have been the end of the matter. I therefore conclude that the actions of the trial court constituted a prima facie violation of *Webb*.[3]

---

3. Defendant's counsel did not object to the court's colloquy with Ms. Scott at the time it occurred, other than to point out the mistaken quotation of the perjury statute. Ordinarily this would require me to review only for plain error. The Supreme Court, however, has ruled that there is no need for a contemporaneous objec-

tion. "The suggestion that the petitioner or his counsel should have interrupted the judge in the middle of his remarks to object is, on this record, not a basis to ground a waiver of the petitioner's rights." *Webb*, 409 U.S. at 97, 93 S.Ct. at 353. The similarity of the facts of this case to those in

## II

Having found a *Webb* violation in this instance, I turn to causation, i.e. whether there is "some plausible nexus between the challenged governmental conduct and the absence of certain testimony." *United States v. Hoffman*, 832 F.2d 1299, 1303 (1st Cir. 1987). This requirement exists because "had the witness been unwilling to testify in [defendant's] behalf all along, the judge's comments, though wrong, could not have been a causative factor." *Id.* The majority argues that causation is not made out because the witness invoked her Fifth Amendment privilege two weeks after the initial hearing, before another judge. I cannot agree.

I believe that the First Circuit was correct in holding that to establish a *Webb* violation, there must be "some contested act or omission [which] (1) can be attributed to the sovereign and (2) causes the loss or erosion of testimony which is both (3) material to the case and (4) favorable to the accused." *Id.* Based on the trial transcripts and the proffered affidavits, there can be no issue of (1), (3), or (4). I therefore focus on prong (2), whether the first district judge's actions can fairly be said to have caused the witness to decide not to testify.

In *Webb*, as in this case, the witness was actually in court and on the stand when the admonition was given. *Webb*, 409 U.S. at 95, 93 S.Ct. at 351. The Supreme Court stated, "The fact that [the witness] was willing to come to court to testify in the petitioner's behalf, refusing to do so only after the judge's lengthy and intimidating warning, strongly suggests that the judge's comments were the cause of [the witness's] refusal to testify." *Id.* at 97, 93 S.Ct. at 353. Consequently, the Court summarily reversed without considering the issue of causation further. *Id.* at 98, 93 S.Ct. at 353.

The facts in this case in several ways are even more clear than in *Webb*. The witness was not only in court but had begun to testify. She had given two prior sworn statements in favor of the defense, as well as a taped interview, and her attorney represented that she had discussed the matter thoroughly with both her attorney and her family. While the subsequent refusal to testify was both at a later date and before a different judge, I do not view these distinctions as sufficient to distinguish *Webb*. The record contains no evidence suggesting that other intervening factors influenced the witness's decision not to testify. Further, since the first district judge only partially recused himself from the case, any possible retrial might have found the witness testifying before him again.

The standard of causation in *Webb* cases is a light one. The conduct in question need only substantially interfere with the witness's decision to testify. *See United States v. Crawford*, 707 F.2d 447, 449 (10th Cir.1983). Should that occur, there is no error only if "the witness [had] been unwilling to testify all along." *Hoffman*, 832 F.2d at 1303. I therefore believe that, as a matter of law, there is a "plausible nexus between the challenged governmental conduct and the absence of [the] testimony." *Id.* At a minimum, there is an issue of fact which requires a reversal and a remand for a hearing on the issue of causation.

I would reverse the judgment of the district court.

---

*Webb* constrain me to reach the same conclusion here. *Contra Blackwell*, 694 F.2d at 1340.

This case is slightly more complex given the overlapping of the trial court's decision to recuse itself and its admonitions to Ms. Scott. However-

er, I am satisfied that the recusal did not actually take effect until the adjournment of the hearing, so the admonitions were delivered by the court in its official capacity.